UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| TOMMY CRUM, THE LITTLE LLOYD, LLC, DAVID MARSH, MICHAEL YOUNCE II, NATHANIEL WESTON, R/WES PROPERTIES, INC., SANDY MARSH, WILLIAM BENNETT, BENNETT'S BAIT, LLC, STANLEY CREWS, STEWART SADLER, JERRY AUSTIN, JR., WALTER MASON, TED SMITHWICK, WILLIAM MCCLAIN, THURMOND KERN, ALONZO GRIFFIN JOSEPH WILLIAMS, JO ANN B, INC., BERNARD PANIAGUA, WILLIE DAVIS, PAUL ROBINSON, LINE SINK, INC., DUDLEY WILLIAMS,BENITO RODRIGUEZ, RICHARD SKINNER, AMBER WAVES, INC., BENNETT PANIAGUA, LESLIE JACOBS, GEORGE ORMOND, JOSEPH RAULS MISS BERNADETTE, LLC, CHARLES JONES, JOHNNY BENNETT, JONATHAN BENNETT, BRANDE RAY, INC., GIDGET MCDONALD, G.M.'S VESSEL, LLC, BRIAN VICKERS, and DARYLE BRINSON,<br><br>        Plaintiffs,<br><br>vs.<br><br>GL NV24 SHIPPING, INC., HYUNDAI GLOVIS CO., G-MARINE SERVICE CO., LTD, NORTON LILLY INTERNATIONAL, T & T SALVAGE, LLC, and JOHN DOE ENTITIES 1 THROUGH 10,<br><br>        Defendants. | CIVIL ACTION NO. **CV222-085**<br><br>**TRIAL BY JURY DEMANDED** |

-1-

## VERIFIED COMPLAINT FOR CIVIL PENALTIES, INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES AND EXPENSES OF LITIGATION

COME NOW, Plaintiffs Tommy Crum, The Little Lloyd, LLC, David Marsh, Michael Younce II, Nathaniel Weston, R/WES Properties, Inc., Sandy Marsh, William Bennett, Bennett's Bait, LLC, Stanley Crews, Stewart Sadler, Jerry Austin, Jr., Walter Mason, Ted Smithwick, William McClain, Thurmond Kern, Alonzo Griffin, Joseph Williams, Jo Ann B, Inc., Bernard Paniagua, Paul Robinson, Willie Davis, Benito Rodriguez, Dudley Williams, Line Sink, Inc., Richard Skinner, Amber Waves, Inc., Bennett Paniagua, Leslie Jacobs, George Ormond, Joseph Rauls, Miss Bernadette, LLC, Charles Jones, Jonathan Bennett, Johnny Bennett, Brande Ray, Inc., Gidget McDonald, G.M.'s Vessel, LLC, Brian Vickers, and Daryle Brinson and file this Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation against Defendants GLNV24 Shipping, Inc., Hyundai Glovis Co., G-Marine Service Co., Ltd, Norton Lilly International, T&T Salvage LLC (collectively, "Defendants"), and John Doe Entities 1 through 10 alleging as follows:

### NATURE OF THE ACTION

1.     At approximately 1:40 a.m. on September 8, 2019, the M/V Golden Ray ("Golden Ray"), a 656 foot long, two-year-old car and truck carrier owned by GLNV24 Shipping Inc., chartered by Hyundai Glovis Co., and operated by G-Marine Service Co., Ltd. capsized in the St. Simons Sound, off the coast of Georgia.

2.     At that time, the Golden Ray was carrying approximately 4,300 vehicles and

-2-

had 300,000 gallons of heavy bunker fuel in 24 tanks on board. Leaking fuel polluted the surrounding waterways and land, including, but not limited to, the St. Simons Sound (the "Sound"), south to Jekyll Island and Cumberland Island, north to parts of St. Simons Island and Sea Island, and up the Mackay River and its adjacent marshes, east up East and South Brunswick Rivers and their adjacent marshes, and surrounding the southern end of Blythe Island and its marshlands.

3.      Salvage operations of the wreck began in 2019 and caused fires and numerous separate discharges of oil and oil-based pollutants into the Sound. One such spill during the first week of July 2021 prompted health officials to issue warnings to would be swimmers and fishers and resulted in additional damage to the Sound and the surrounding coastal environment. Another catastrophic event, the most severe and extensive to date, caused additional oil to begin leaking on July 31, 2021, and was not capped until August 8, 2021. This oil remains suspended in the water column and embedded in the sediment in and around the Sound.

4.      The Golden Ray's capsize and subsequent salvage operations further caused solid waste, particularly cars, car parts, and related materials to fall into the Sound, to be embedded or carried off with the currents and tidal changes.

5.      Plaintiffs bring claims under the Federal Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.*, the Federal Water Pollution Control Act, 33 U.S.C. § 1365, the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and negligence under general maritime law, as well as pendent state law claims of negligence, negligence per se, trespass,

public nuisance, and strict liability for ultrahazardous activity.

6.      Plaintiffs seek declaratory relief as well as an injunction ordering Defendants to remediate the Sound and surrounding waters and marshlands, pay civil penalties to the U.S. Treasury and reimburse Plaintiffs for their attorneys' fees and expenses of litigation. Plaintiffs further seek damages for their injuries and economic losses, including damages sustained to personal property, compensation for their lost income/business and for their annoyance and inconvenience, and punitive damages.

## PARTIES

7.      All Plaintiffs herein are individuals and entities actively engaged in Georgia's commercial shrimping and/or crabbing industries.

8.      Plaintiff Tommy Crum ("Plaintiff Crum") is a commercial shrimper and the owner of The Little Lloyd, LLC and the shrimping vessel The Little Lloyd. Plaintiff Crum resides at 332 Oyster Road, Brunswick, Georgia 31523.

9.      Plaintiff The Little Lloyd, LLC ("Plaintiff The Little Lloyd") is a corporation registered to do business in the state of Georgia.

10.     Plaintiff David Marsh ("Plaintiff D. Marsh") is a commercial shrimper and the captain of the shrimping vessel The Little Lloyd. Plaintiff Marsh resides at 2251 Buck Swamp Road, Brunswick, Georgia 31523.

11.     Plaintiff Michael Younce II ("Plaintiff Younce") is a commercial shrimper and fisherman. Plaintiff Younce resides at 670 Emanuel Church Road, Brunswick, Georgia 31523.

-4-

12.    Plaintiff Nathaniel Weston ("Plaintiff Weston") is a commercial shrimper, the owner of R/WES Properties, Inc., which owns of the shrimping vessel Mrs. Shirley Mae. Plaintiff Weston resides at 125 Standing Oak Place, Fayetteville, Georgia 30214.

13.    Plaintiff R/WES Properties, Inc. ("Plaintiff R/WES") is a corporation registered to do business in the state of Georgia.

14.    Plaintiff Sandy Marsh ("Plaintiff S. Marsh") is the co-owner of Bennett's Bait, LLC d/b/a George's Bait, a commercial bait shop in Glynn County, Georgia. Plaintiff S. Marsh resides at 135 Lynch Road, Brunswick, Georgia 31520.

15.    Plaintiff William Bennett ("Plaintiff W. Bennett") is the co-owner of Bennett's Bait, LLC d/b/a George's Bait, a commercial bait shop in Glynn County, Georgia. Plaintiff W. Bennett resides at 420 Scranton Road, Brunswick, Georgia 31525.

16.    Plaintiff Bennett's Bait, LLC d/b/a George's Bait ("Plaintiff Bennett's Bait") is a corporation registered to do business in the state of Georgia.

17.    Plaintiff Stanley Crews ("Plaintiff Crews") is the owner of Jekyll Fishing Center, a retail bait and tackle shop on Jekyll Island, Georgia. Plaintiff Crews resides at 15 Morrison Creek Lane, Brunswick, Georgia 31523.

18.    Plaintiff Stewart Sadler ("Plaintiff Sadler") is a commercial shrimper. Plaintiff Sadler resides at 134 Winding Trail, Brunswick, Georgia 31523.

19.    Plaintiff Jerry Austin, Jr. ("Plaintiff Austin") is a commercial shrimper and the owner and captain of the shrimping vessel Captain Snapper. Plaintiff Austin resides at 127 Windsor Circle, Brunswick, Georgia 31525.

20.     Plaintiff Walter Mason ("Plaintiff Mason") is a commercial shrimper. Plaintiff Mason resides at 4223 Roadway Street, Brunswick, Georgia 31520.

21.     Plaintiff Ted Smithwick ("Plaintiff Smithwick") is a commercial shrimper and the owner and captain of the shrimping vessel Daddy's Girls. Plaintiff Smithwick resides at 1429 Norman Avenue NE, Townsend, Georgia 31331.

22.     Plaintiff William McClain ("Plaintiff McClain") is a commercial shrimper. Plaintiff McClain resides at 305 Royal Pines Way, Kingsland, Georgia 31548.

23.     Plaintiff Thurmond Kern ("Plaintiff Kern") is a commercial shrimper and the owner and captain of the shrimping vessel the Lady Raven. Plaintiff Kern resides at 256 Willis Road, Hortense, Georgia 31543.

24.     Plaintiff Alonzo Griffin ("Plaintiff Griffin") is a commercial shrimping. Plaintiff Griffin resides at 901 Cleburne Street, Brunswick, Georgia 31520.

25.     Plaintiff Joseph Williams ("Plaintiff J. Williams") is a commercial shrimper, the owner of Jo Ann B, Inc., and the owner and captain of the shrimping vessel the Jo Ann B. Plaintiff J. Williams' address is 16 Seventh Street, Brunswick, Georgia 31520.

26.     Plaintiff Jo Ann B, Inc. ("Plaintiff Jo Ann B") is a corporation registered to do business in the state of North Carolina.

27.     Plaintiff Bernard Paniagua ("Plaintiff Bernard Paniagua") is a commercial shrimper. Plaintiff Bernard Paniagua resides at 8516 65th road, Regal Park, New York 11374.

28.     Plaintiff Paul Robinson ("Plaintiff Robinson") is a commercial shrimper. Plaintiff Robinson resides at 207 Camelia Cove, Brunswick, Georgia 31520.

-6-

29.     Plaintiff Willie Davis ("Plaintiff Davis") is a commercial shrimper. Plaintiff Davis resides at 188 Water Tower Road, Fairfield, North Carolina 27826.

30.     Plaintiff Benito Rodriguez ("Plaintiff Rodriguez") is a commercial shrimper. Plaintiff Rodriguez resides at 9 Summerlin Drive, Engelhard, North Carolina 27824.

31.     Plaintiff Dudley Williams ("Plaintiff D. Williams") is a commercial shrimper, the owner of Line Sink, Inc., and the owner and captain of the shrimping vessel the Little Bit. Plaintiff D. Williams resides at 3100 Hodges Road, Scranton, North Carolina 27875.

32.     Plaintiff Line Sink, Inc. ("Plaintiff Line Sink") is a corporation registered to do business in the state of North Carolina.

33.     Plaintiff Richard Skinner ("Plaintiff Skinner") is a commercial shrimper, the owner of Amber Waves, Inc., and the owner and captain of the shrimping vessel Amber Waves. Plaintiff Skinner resides at 1346 Sapelo Avenue NE, Townsend, Georgia 31331.

34.     Plaintiff Amber Waves, Inc. ("Plaintiff Amber Waves") is a corporation registered to do business in the state of Georgia.

35.     Plaintiff Bennett Paniagua ("Plaintiff Bennett Paniagua") is a commercial shrimper. Plaintiff Bennett Paniagua resides at 460 West Old Country Road, Belhaven, North Carolina 27810.

36.     Plaintiff Leslie Jacobs ("Plaintiff Jacobs") is a commercial shrimper and the owner and captain of the shrimping vessel The Liberty Bell. Plaintiff Jacobs resides at 809 K Street, Brunswick, Georgia 31523.

37.     Plaintiff George Ormond ("Plaintiff Ormond") is a commercial shrimper and

the owner and captain of the shrimping vessel Just Right. Plaintiff Ormond resides at 3032 Possum Hill Road, Bath, North Carolina 27810.

38.     Plaintiff Joseph Rauls ("Plaintiff Rauls") is a commercial shrimper, the owner of Miss Bernadette, LLC, and the owner and captain of the shrimping vessel Miss Bernadette. Plaintiff Rauls resides at 10798 Ga. Hwy 10, Woodbine, Georgia 31569.

39.     Plaintiff Miss Bernadette, LLC ("Plaintiff Miss Bernadette") is a corporation registered to do business in the state of Georgia.

40.     Plaintiff Charles Jones ("Plaintiff Jones") is a commercial shrimper and the owner and captain of the shrimping vessel the Carol Jean. Plaintiff Jones resides at 1961 Franklin Street, Darien, Georgia 31315.

41.     Plaintiff Jonathan Bennett ("Plaintiff Jonathan Bennett") is a commercial shrimper and the captain of the shrimping vessel Flying Cloud, owned by his father Johnny Bennett. Plaintiff Jonathan Bennett's address is 132 Lodge Road, Waynesville, Georgia 31566.

42.     Plaintiff Johnny Bennett ("Plaintiff Johnny Bennett") is commercial shrimper, the owner of Brande Ray, Inc., the owner and captain of the shrimping vessel Dora F, and the owner of shrimping vessel Flying Cloud. Plaintiff Johnny Bennett's address is 132 Lodge Road, Waynesville, Georgia 31566.

43.     Plaintiff Gidget McDonald ("Plaintiff McDonald") is a commercial shrimper, the owner of G.M.'s Vessel, LLC, and the owner of the shrimping vessel Ms. Bonnie. Plaintiff McDonald resides at 2251 Buck Swamp Road, Brunswick, Georgia 31523.

-8-

44.     Plaintiff G.M.'s Vessel, LLC ("Plaintiff G.M.'s Vessel") is a corporation registered to do business in the state of Georgia.

45.     Plaintiff Brian Vickers ("Plaintiff Vickers") is a commercial crabber who owns and operates his own crabbing vessel. Plaintiff Vickers resides at 1133 Franklin Street, Darien, Georgia 31305.

46.     Plaintiff Daryle Brinson ("Plaintiff Brinson") is a commercial crabber who owns and operates his own crabbing vessel. Plaintiff Brinson resides at 110 Brinson Lane, Brunswick, Georgia 31525.

47.     Defendant GLNV24 Shipping, Inc. ("Defendant GLNV24"), owner of the Golden Ray, is organized under the laws of the Republic of South Korea and is doing business in Georgia and throughout the United States transporting Hyundai Motor, Kia Motors and other vehicles.

48.     Defendant Hyundai Glovis Co. ("Defendant Hyundai"), manager and charterer of the Golden Ray, is organized under the laws of the Republic of South Korea and is doing business in Georgia and throughout the United States transporting Hyundai Motor, Kia Motors, and other vehicles. Hyundai Glovis Co. has a North American trade team that reviews cargo and talks to customers about what cargo is available and what will be loaded and has a local vessel operator who works with the Golden Ray throughout the United States.

49.     Defendant G-Marine Service Co., Ltd. ("Defendant G-Marine") is organized under the laws of the Republic of South Korea and is doing business in Georgia and throughout the United States. G-Marine Service Co., Ltd., is the operator and technical

-9-

superintendent that managed the crew of the Golden Ray and maintained responsibility for the safety management system on the Golden Ray.

50.     Defendant Norton Lilly International ("Defendant Norton Lilly") is organized in Alabama with its principal place of business at One St. Louis Center, Suite 5000, Mobile, Alabama, 36602. Norton Lilly International conducted business in Georgia as the Golden Ray's agent in the Port of Brunswick. As the Golden Ray's agent, Norton Lilly worked with the Golden Ray's crew to ensure cargo was loaded safely and properly and that appropriate safeguards were in place to ensure the safe transport from the Port of Brunswick to its final destination.

51.     Defendant T&T Salvage LLC ("Defendant T&T") is organized in Texas with its principal place of business at 8717 Humble Westfield, Humble, TX 77338. T&T Salvage LLC was in charge of and conducted the wreck removal of the Golden Ray from St. Simons Sound in Brunswick, Georgia.

52. John Doe Entities 1 through 10 are the names designated by Plaintiffs of a corporation, person or other entity, which may be related in some fashion to the Defendants named herein and who or which may have an ownership interest or exercise some form of control over the Golden Ray and/or been involved in salvage operations regarding the Golden Ray and the resulting harm. At all relevant times, individually or with other defendants, it or them have been an owner, manager, operator, and/or exercised control of the Golden Ray or been involved in salvage operations regarding the Golden Ray and the resulting harm. Plaintiff will amend to correct any misnomer of the names of Defendants

-10-

once the correct names of the entities are determined.

## JURISDICTION AND VENUE

53.     This Court has jurisdiction over this case pursuant to 33 U.S.C § 2717, 33 U.S.C. § 1365, and 42 U.S.C. § 6972.

54.     This Court has supplemental jurisdiction over the pendent state law claims as they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

55.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all of the events, actions, and/or omissions giving rise to Plaintiffs' claims occurred in this district.

## NOTICE OF INTENT TO SUE UNDER THE CLEAN WATER ACT AND RESOURCE CONSERVATION AND RECOVERY

56.     On August 11, 2021, Plaintiffs sent Defendant Hyundai Glovis Co., among other entities, notice of their intent to file suit for violations of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") and make claims under the Oil Pollution Act of 1990 ("OPA") for the harm caused by the Golden Ray's capsize and the subsequent salvage operations. This letter further notified Defendant Hyundai Glovis Co. of Plaintiffs' intent to bring pendent state law claims of nuisance, negligence, negligence per se, and for attorney's fees, costs, and expenses. This letter is attached hereto as Exhibit "A."

57.     On November 18, 2021, Plaintiffs sent various entities a 60-Day Notice of Intent to Sue Under the Clean Water Act and the Federal Resource Conservation and Recovery Act ("RCRA"). Thereafter, on December 28, 2021, Plaintiffs hand delivered a translated copy of this notice to Defendant Hyundai Glovis Co., Ltd. in Seoul, Korea. Copies of the English and Korean versions of this notice are attached as Exhibit "B."

58.   On December 23, 2021, Plaintiffs mailed Defendants Hyundai Glovis Co. and

GLNV24 Shipping Inc. another 60-Day Notice of Intent to Sue Under the Clean Water Act

and Resource Conservation and Recovery Act. This notice is attached hereto as Exhibit "C."

59.   More than ninety days have passed since Plaintiffs provided Defendants with

notice and Defendants have failed to cease the CWA and RCRA violations.

## OIL POLLUTION ACT PRESENTMENT OF CLAIMS

60.   Between May 9, 2022 and June 3, 2022,[1] all Plaintiffs presented their

respective claims to the designated representative of the responsible party, GLNV24

Shipping, Inc., under 33. U.S.C. § 2713(a).

61.   More than 90 days have passed since the presentation of all Plaintiffs'

respective claims, and Defendants have denied and/or not paid the claims.

62.   Therefore, Plaintiffs have complied with and/or satisfied all conditions

precedent prior to filing these claims.

---
[1]

The following claims were presented on May 9, 2022: Tommy Crum, The Little Lloyd, LLC, Nathaniel Weston, R/WES Properties, Inc., Sandy Marsh, and Bennett's Bait, LLC

The following claims were presented on May 12, 2022: William Bennett and Stanley Crews

The following claim was presented on May 16, 2022: Stewart Sadler

The following claims were presented on May 17, 2022: Jerry Austin, Jr. and Brian Vickers

The following claims were presented on May 19, 2022: Ted Smithwick and Walter Mason

The following claim was presented on May 23, 2022: William McClain

The following claim was presented on May 24, 2022: Thurmond Kern

The following claims were presented on May 25, 2022: Joseph Williams, Jo Ann B, Inc., Willie Davis, Bernard Paniagua, Paul Robinson

The following claims were presented on May 28, 2022: Dudley Williams and Line Sink, Inc.

The following claims were presented on May 31, 2022: Richard Skinner and Amber Waves, Inc.

The following claims were presented on June 1, 2022: Bennett Paniagua, Benito Rodriguez, Alonzo Griffin, Leslie Jacobs, Daryle Brinson, George Ormond, Joseph Rauls, and Miss Bernadette, LLC

The following claims were presented on June 3, 2022: Michael Younce, II, Johnny Bennett, Brande Ray, Inc., Jonathan Bennett, Charles Jones, Gidget McDonald, G.M.'s Vessel, LLC, and David Marsh

## FACTUAL ALLEGATIONS

**A.    The Golden Ray Shipwreck and Oil Spill Occurred in the Second Largest Coastal Marshland in the United States.**

63.     On the afternoon of September 7, 2019, the Golden Ray arrived at the Port of Brunswick.

64.     After docking, the shoreside personnel and the Golden Ray's crew began offloading and loading vehicles through the stern ramp.

65.     The chief officer of the Golden Ray was responsible for confirming the vessel's stability and ensuring that all vehicles were properly stowed. The chief officer was also responsible for managing the vessel's ballast water, bilges, and fresh water.

66.     Defendant Norton Lilly, one of the largest providers of agency services for marine companies in North America, contracted with Defendant Golden Ray and related entities to provide a wide range of services for the Golden Ray in the Port of Brunswick, including port services and logistics for all aspects, including the loading and securing of its cargo which included, among other cargo, 4300 automobiles.

67.     As Golden Ray's Agent at the Port of Brunswick, Defendant Norton Lilly managed and advised regarding the needs of the ship, its crew and cargo, as well as the requirements of owners, operators, charterers, inspectors and customs, providing all aspects of port services from ensuring a safe and efficient berth, taking care of crew needs, provisions for the vessel, and efficiency in documents, to coordinating repairs and dry docks, all while proficiently securing the cargo for the voyage.

68.    Defendant Norton advertised that it maintained over 100 years of maritime experience in handling the port needs of its maritime customers.

69.    Defendant Norton while serving as the Golden Ray's agent in the Port of Brunswick on September 7th and 8th, 2019, provided, among other critical services for Golden Ray, electronic notice of arrival and departure reporting and tracking, full vessel clearance, hold cleaning, import customs clearance, lay ups, national export system customs documentation, out of gauge cargo inspection, protection and indemnity advice permitting, port agency clearing and berthing, securing of cargo and vessel loading and discharge of cargo.

70.    Defendant Norton advertised and represented that its "experienced and trained agents" were the "eyes and ears" for Golden Ray while it was at the Port of Brunswick on or about September 7th & 8th, 2019, specializing in ocean freight, including, among other services, cargo monitoring services.

71.    Norton Lilly developed a preliminary load plan (preload plan), which included compiling the proposed cargo to be loaded and offloaded and determining whether there was enough room on board the Golden Ray for the proposed cargo at each port with the projected available space.

72.    Norton Lilly was required to submit to the charterer and chief officer of the Golden Ray a final load plan.

73.    The chief officer of the Golden Ray reviewed Norton Lilly's preload plan to determine whether the vessel could accommodate the weight of the cargo departing port

while still meeting vessel stability requirements.

74.    The chief officer of the Golden Ray consulted Norton Lilly's preload plan to estimate the weight of the cargo and then entered the weight estimates into the ship's LOADCOM computer, a stability computer used to calculate the ship's center of gravity.

75.    The chief officer of the Golden Ray also entered the ships IMACS data for the ballast, fuels, and fresh water into the LOADCOM computer to calculate the ship's center of gravity. The chief officer chose to enter the IMACS data manually into the LOADCOM computer despite the LOADCOM computer being capable of automatically and accurately inputting the IMACS data on its own.

76.    Due to the inaccurate data from Norton Lilly's preload plan and the chief officer's in accurate manual IMACS inputs, the LOADCOM computer did not calculate the vessel's vertical center of gravity prior to the vessel's departure from the Port of Brunswick and thereby the Golden Ray failed to meet stability requirements for operation.

77.    G-Marine Service Co. Ltd, the operator of the Golden Ray, implemented a safety management system (SMS) that required the master of the Golden Ray to approve the chief officer's LOADCOM calculations.

78.    The master of the Golden Ray did not review or verify the chief officer's LOADCOM calculations prior to the vessel's departure from the port as required by the operator's SMS and thereby failed to take any corrective action to stabilize the vessel for its voyage.

79.    On September 8, 2019, a little after 1:00 a.m., the unstable Golden Ray

departed out of the Colonel's Island Terminal in the Port of Brunswick, Georgia, and headed out through St. Simons Sound on its way to Baltimore.

80.     Hurricane Dorian had passed just days before and the United States Army Corps of Engineers ("USACE") and the National Oceanic and Atmospheric Administration ("NOAA") had finished thoroughly scanning the shipping channel--Brunswick Point Cut Range, Cedar Hammock Range and Widener 11, the triangular section of the Sound where vessels take a starboard turn to Plantation Creek Range to head out to open waters. They found that Dorian had no impact and that ships were clear to go underway.

81.     State of Georgia Pilot Captain Johnathan Tennant was at the helm to pilot it out of the Sound, just as he had for the Golden Ray's inbound passage to the Port of Brunswick.

82.     Captain Tennant entered the Golden Ray via the pilot door, which was never closed after his entry.

83.     "Cupcake conditions" – light south wind, calm, good visibility, bright, were described by Captain Tennant, who had by his side the Master of the Golden Ray, Captain Gi Hak Lee, employed by Defendant G-Marine Service, and who had first reported on board the Golden Ray in Freeport, Texas, on August 28, 2019.

84.     Proceeding outbound, Captain Tennant made the turn starboard at Widener 11, headed right and east out of the Sound.

85.     At that time, the unstable vessel listed starboard. Despite last minute efforts to alter the course of events by the Captain, the Golden Ray would not be righted and instead continued to spin starboard.

-16-

86.     Captain Tennant called for help and was focused on keeping the ship away from inbound vessel Emerald Ace and toward a sandbar, avoiding shipwreck beyond the Sound in deeper water.

87.     The Golden Ray came down portside on the edge of the Sound, just northeast of Jekyll Island. It capsized with the starboard side well out of the water, facing the sky.

88.     Fuel oil immediately began to leak out of the vessel.

89.     Fires broke out and burned for nearly 24 hours.

90.     Sea water began to flood through the open pilot door, causing the vessel to flood as it heeled.

91.     Evacuation and rescue operations began in earnest and all twenty-three persons on board were eventually rescued.

92.     On September 23, 2019, the United States Coast Guard reported that oil was leaking from the hull of the ship, characterizing the leaks as "sporadic discharges" and noting that oil was spotted in nearby shorelines, rivers, and marshes.

93.     On October 1, 2019, another discharge of fuel was reported, followed by a report from the Jekyll Island Authority that oil was observed on Jekyll Island beaches and nearshore waters.

94.     The United States Coast Guard ("USGC") and the National Transportation Safety Board ("NTSB") conducted an investigation and hearing on the Golden Ray's capsize and determined that the vessel was not in compliance with the 2008 Intact Stability Code because the vessel had too much cargo at a high center of gravity, a situation that could have

been corrected by ballasting. However, the ballast was not engaged.

95.    The USGC and the NTSB also determined that the vessel had been out of compliance with the 2008 Intact Stability Code during the two (2) prior port stops.

96.    Norton Lilly's final load plan for the Golden Ray's cargo operations at Brunswick was emailed at 0259 on September 8, 2019, which was almost 2 hours after the vessel capsized.

97.    Investigators' post-accident review of the final load plan showed that the total weight of the offloaded vehicles was 319 MT (1.2 MT each), and the total weight of the loaded vehicles was 692MT (1.92 MT each). By the time cargo operations were completed, there were 4,161 vehicles on board, and the total cargo weight was 8,780.2 MT, an increase of 94 vehicles and an increase in cargo weight of about 373 MT from when the vessel arrived in Brunswick, making the ship unstable and resulting in the catastrophe.

98.    Upon completion of its investigation, the USCG and NTSB concluded that, the vessel was loaded with too many vehicles placed at a high center of gravity, top-heavy, and had been in danger of capsizing since its loading in Freeport, Texas. The vessel's improper loading occurred despite coordination between Defendants GLNV24, Hyundai Glovis, G-Marine Services, and Norton Lilly, who were responsible for submission of a preliminary and final loading plan.

99.    G-Marine Service Co, Ltd., the operator, did not have a training program for the LOADCOM computer. Furthermore, the chief officer was only given a few hours of training on the LOADCOM computer when he joined the crew of the Golden Ray and, prior

to joining the Golden Ray crew, he had never used a LOADCOM computer.

100.    G-Marine Service Co., Ltd.'s did not implement adequate procedures to verify the chief officer's calculations. Thus, neither the master or the chief officer were aware the Golden Ray had been sailing without meeting stability requirements for at least several weeks prior to the incident.

**B.  The Salvage Operation Caused Multiple Fires and On-Going Oil Spills, and Dumped Cars, Car Parts, and Debris into the Sound.**

101.    The Golden Ray was grounded near environmentally sensitive areas that serve as a unique habitat for a variety of species, including, but not limited to, shrimp, fish, migratory birds, crabs, and food sources for all marine life, including, but not limited to, fiddler crabs.

102.    The coastal environment is also the main attraction of tourism to the area and serves as the epicenter for Georgia's commercial shrimping and crabbing industries.

103.    Georgia's most valuable seafood products include white shrimp *(Litopenaeus setiferus)*, brown shrimp (*Farfantepenaeus aztecus*), and blue crabs (*Callinectes sapidus*).

104.    The area where the Golden Ray was grounded is colloquially known as "Snag Alley" and serves as one of the prime locations for Georgia's commercial shrimping and crabbing industries' trawling and trapping practices.

105.    On or about October 29, 2019, in attempt to stabilize the wreckage, Defendants caused over 6,000 tons of rocks to be dropped in Snag Alley and around the Golden Ray.

106.    By December 12, 2019, approximately 320,000 gallons of fuel, mixed with water, were pumped out, and approximately 44,000 gallons of petroleum products, hazardous

substances, and 4,200 cars remained submerged in local waters.

107.    On December 17, 2019, Defendant T&T submitted a proposal to Defendant GLNV24 to perform a large-section demolition and removal of the Golden Ray wreck.

108.    Defendant GLNV24 accepted the proposal and apparently determined that large-section demolition would be the safest and environmentally sound method for removing the Golden Ray wreck.

109.    In January 2020, Defendant T&T took over responsibility for removing the Golden Ray from the Sound from Donjon-Smit, LLC, a company that was initially hired to perform the removal.  Donjon-Smit, LLC disagreed with the manner of the removal and lawsuits were filed by Donjon-Smit, LLC regarding its contract. In that lawsuit, testimony was given that confirmed Donjon-Smit, LLC's cautions about environmental issues with the proposed removal plan of Defendant T&T.

110.    Defendant T&T's Wreck Removal Plan set out to mechanically cut the vessel with chain or tungsten cutting wire into eight (8) large sections, each expected to weigh between 2,700 to 4,100 tons, to then be lifted onto barges for disposal using a floating crane.

111.    Defendant T&T's Wreck Removal Plan included the placement of an Environmental Protection Barrier ("EPB") that was intended to contain pollutants from the vessel and mitigate the effects of potential discharges.

112.    Defendant T&T's Wreck Removal Plan alleged that the limited number of large cuts would reduce the potential of inaccessible and up-pumpable hydrocarbons and other pollutants from impacting the waters surrounding the wreck removal site, and that the

-20-

EPB would provide a protective barrier along the seabed, throughout the water column, and at the surface level allowing for the retention and recovery of debris and other pollutants.

113.     Defendant T&T characterized the potential for spills to be minor and controllable.

114.     By January 19, 2020, an additional fire broke out on the vessel.

115.     The EPB was not in place until June 1st, 2020.

116.     After multiple delays, the cutting and lifting operations for the first section finally began on November 6, 2020. Within two (2) days, the cutting chain broke.

117.     Repeated fires causing additional discharges of debris and hazardous fluids occurred throughout the duration of wreck removal.

118.     Several substantial oil leaks from the wreck have made it past the EPB, allowing oil to infiltrate the coastal wetlands, marshlands, estuaries, and beaches, including those notably occurring on June 1st, July 1st, and July 31st, 2021.

119.     This oil and other oil-based pollutants are likely to remain suspended in the water column and embedded in the sediment for the foreseeable future.

120.     The salvage operations also caused numerous cars, car parts, and other debris to fall into the Sound where many remain, while others were carried off in the currents. Car parts and debris have and continue to wreak havoc on shrimping and crabbing operations, including those of Plaintiffs herein, as the debris prevents access to Snag Alley, and blocks and damages equipment utilized in these industries.

121.     Salvage operations were completed in October 2021.

122. The presence of the Golden Ray wreckage, the EPB, 6,000 tons of rocks, Defendants' personnel and machinery involved in salvage efforts, car parts and debris, oil and hazardous substances, and the fear of the presence of oil and other hazardous substances, have and continue to prevent Plaintiffs from fully operating their shrimping and crabbing businesses in and around the Sound, including Snag Alley, and adjacent and nearby waterways.

123. Despite attempts to shrimp and crab in other areas, Plaintiffs' shrimping and crabbing has been greatly affected by a large decrease in catch volume and damage to vessels and netting due to Golden Ray debris and tremendous increases in the cost of gas and oil and other special costs to be proven at trial resulting from the inability to shrimp and crab in the affected areas.

## COUNT I

## STRICT LIABILITY UNDER THE OIL POLLUTION ACT OF 1990

(AGAINST GLNV24 SHIPPING INC. AND HYUNDAI GLOVIS CO.)

124. Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

125. The Federal Oil Pollution Act of 1990 provides that "each responsible party for . . . a facility for which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident." 33. U.S.C. § 2702(a).

126. An incident is "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the

discharge or substantial threat of discharge of oil . . ." 33 U.S.C. § 2701(14).

127.    Recoverable damages include damages for natural resources, real or personal property, subsistence use, revenues, profits and earning capacity, and public services. 33 U.S.C. § 2702(b)(2).

128.    On September 8, 2019, and multiple occasions thereafter, Defendants discharged or leaked heavy fuel oil and other hazardous substances into the Sound and Defendants GLNV24 and Hyundai are therefore strictly liable under OPA as responsible parties for recoverable damages. Defendants G-Marine and Norton Lilly are liable for their grossly negligent conduct in the loading process.

129.    As a direct and proximate result of Defendants' discharges of oil and other hazardous substances, and their negligent or grossly negligent salvaging operations, including the possible use of firefighting foam, the local environmental and the natural resources upon which Plaintiffs rely have been destroyed or injured.

130.    As a direct and proximate result of Defendants' discharges of oil and other hazardous substances and their effects on the local environment, Plaintiffs ability to use the area's natural resources, such as the local marshes, rivers, beaches, estuaries, fish, shrimp, and crabs has been greatly inhibited. Moreover, the food sources for fish, shrimp, and crabs have been greatly diminished due to the discharges of oil and other hazardous substances and their effects on the local environment.

131.    As a direct and proximate result of Defendants' discharges of oil and other hazardous substances and their effects on the local environment, Plaintiffs have been unable

to use the natural resources for which Plaintiffs rely for subsistence use.

132.   As a direct and proximate result of Defendants' discharges of oil and other hazardous substances and their effects on the local environment, Plaintiffs have sustained injury and economic losses to their shrimping and crabbing income and businesses.

133.   As a direct and proximate result of Defendants' discharges of oil and other hazardous substances and their effects on the local environment, Plaintiffs have suffered damages, including loss of profits and impairment of earning capacity due to injury, destruction, or loss of personal property and natural resources.

134.   As a result of the oil spills, the Plaintiffs not been able to use natural resources, such as the marshes, rivers, beaches, estuaries, parks, fish, shrimp, crab, water and potentially other areas and spaces, that have become contaminated by the spilled oil and other contaminants, and Plaintiffs are entitled to recover from Defendants for such damages and loss of use. 33 U.S.C. § 2702(b)(2).

135.   As a result of the oil spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property, including "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution of the value of their property."

136.   As a result of the oil spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[d]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources

which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

137.    The contamination caused by the discharge of oil resulted in natural resource damages to marshlands, estuaries, beaches, rivers, and parks, contaminating fish, shrimp, crab, and bird habitats and injuring Plaintiffs.

138.    As a result of the oil spill, the Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for recovery for "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

139.    As set forth above, Defendants are strictly liable to Plaintiffs under OPA in amounts to be determined at trial.

## COUNT II

### ONGOING VIOLATIONS OF SECTIONS 301 AND 402 OF THE CLEAN WATER ACT

(AGAINST ALL DEFENDANTS)

140.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

141.    Section 301(a) of the Clean Water Act prohibits the "discharge of any pollutant by any person" except in compliance with the Act. 33 U.S.C. § 1311(a).

142.    Section 402 establishes the National Pollutant Discharge Elimination System ("NPDES") permitting program which prohibits the discharge of pollutants from "point sources" into "waters of the United States" without an NPDES permit or in violation of the

terms and conditions of an NPDES permit. 33 U.S.C.§ 1342.

143.   Section 502(14) of the Clean Water Act defines "point source" as "any discernable, confined and discrete conveyance . . . ." 33 U.S.C. § 1362.

144.   Under section 505(a)(1) of the CWA, any citizen may commence a civil action for injunctive relief or declaratory relief against "any person" alleged to be engaging in the unpermitted discharge of a pollutant.  33 U.S.C. § 1365(a)(1).

145.   In an action brought under section 505(a) of the CWA, the Court has jurisdiction to order Defendants to comply with the Act and to assess civil penalties under section 309(d) of the CWA, 33 U.S.C. § 1319(d).

146.   Section 309(d) of the CWA provides that any person who violates section 301 of the Act, 33 U.S.C. § 1311, or violates any permit condition or limitation in a NPDES permit issued under 33 U.S.C. § 1342, "shall be subject to a civil penalty" payable to the United States for each violation.  33 U.S.C. § 1319(d). Pursuant to 40 C.F.R. § 19.4, the civil penalty to be assessed is $59,973 per day for each CWA violation that occurred after November 2, 2015 where the penalty is assessed after January 12, 2022. 40 C.F.R. § 19.4 (2020).

147.   Additionally, under section 505(d) of the CWA, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing party or substantially prevailing party, whenever the court determines that such award is appropriate."  33 U.S.C. §1365(d).

148.   Since September 8, 2019, Defendants combined negligence has caused the

-26-

discharge of significant amounts of oil, including bunker fuel, petroleum-based chemicals, and other pollutants contained on the Golden Ray and within the vehicles and other cargo stored on the ship during the ship's capsize and subsequent salvaging efforts, including during firefighting efforts.

149.    Each discharge has resulted in the disbursement and deposition of these pollutants into the sediment in and around the Sound, including the beaches and marshes on St. Simons Island, Jekyll Island, and in Brunswick.

150.    The foregoing conduct by Defendants violated and continues to violate sections 301 and 402 of the CWA.

151.    Defendants have failed to cease their violations of sections 301 and 402 of the CWA and these violations are continuous and/or reasonably likely to reoccur.

152.    Plaintiffs are entitled to attorneys' fees and expenses pursuant to 33 U.S.C. § 1365(d) of the CWA. Additionally, civil penalties and injunctive relief should be imposed against Defendants for past and ongoing violations of the CWA.

## COUNT III

### ONGOING VIOLATIONS OF THE RESOURCE CONSERVATION AND RECOVERY ACT

#### (AGAINST ALL DEFENDANTS)

153.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

154.    A violation of RCRA exists where any person has contributed to or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any "solid waste" which "may" present an imminent and substantial endangerment to health

or the environment. 42 U.S.C. § 6972(a).

155.   RCRA defines "solid waste" to include "any garbage, refuse . . . and other discarded material . . . resulting from industrial [and] commercial . . . operations." 42 U.S.C. § 6903(27).  Discarded material includes material that is cast aside, rejected, abandoned, or given up.

156.   RCRA further prohibits any solid waste management practice or disposal of solid waste that constitutes "open dumping." 42 U.S.C. § 6945(a).

157.   Since September 8, 2019, Defendants combined negligence has caused the cast aside, rejected, abandoned, and discarded cars, car parts, and related materials and debris contained on the Golden Ray into the Sound, where they remain and/or were disbursed by tidal currents.

158.   Many of these cars, car parts, materials, and debris, including car frames and engines filled with oil and other toxic substances, remain at the bottom of the Sound. These discarded materials present an imminent and substantial endangerment to the health of the citizens, like Plaintiffs, that navigate, recreate, and rely on these waters.

159.   These cars, car parts, materials, and debris present an imminent and substantial endangerment to the environment as they have changed the underwater topography of the Sound while also releasing toxic pollutants which have impacted the underwater ecology, including impacts to macro and micro invertebrates and benthic organisms, among others.

160.   Defendants' discarding of cars, car parts, materials, and debris constitutes open dumping that poses a reasonable probability of adverse effects on the health and safety of

-28-

those that come into contact as well as to the environment.

161.    Defendants' RCRA violations have been continual since the Golden Ray capsized and continue unabated.

162.    Plaintiffs are entitled to attorneys' fees and expenses pursuant to 42 U.S.C. § 6972(e). Additionally, civil penalties pursuant to 42 U.S.C. § 6928, and injunctive relief should be imposed against Defendants for past and ongoing violations of the RCRA.

**COUNT IV**

**DAMAGES UNDER THE GEORGIA CODE § 12-5-501, ET SEQ.**

(AGAINST ALL DEFENDANTS)

163.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

164.    Defendants are responsible parties as defined by O.C.G.A. § 12-5-500 (8).

165.    From the initial loading, to initial oil spill on September 8, 2019, and the discharges thereafter, Defendants GLNV24, Hyundai, G-Marine, T&T, and Norton Lilly, through their acts and omissions as fully set forth herein, caused the discharge or leaking of oil and other hazardous substances and other contaminants into the Sound from the salvage of Golden Ray.

166.    As a result of these discharges of oil and other contaminants, Plaintiffs have suffered and will continue to suffer damages to their personal property and business interests due to the harm caused to marshes, rivers, beaches, estuaries, parks, fish, shrimp, crab, water and potentially other areas and spaces that have become contaminated by the discharges. Plaintiffs are entitled to recover from Defendants for such damages and loss of use. GA Code

-29-

§ 12-5-501.

167.    Despite the installation of a barrier to contain the oil and other fluids, Defendants negligently and grossly negligently caused the discharge or leaking of additional oil and other toxic and hazardous substances from the Golden Ray into the Sound, outside of the barrier, causing further damages to Plaintiffs' personal property and the local natural resources, such as marshland and estuaries, further contaminating fish, shrimp, crab, bird, and other wildlife habitats.

168.    As set forth above, as a result of improper loading, the Golden Ray's capsize, resultant initial oil spill, and the subsequent and repeated discharges of fuel oil and other substances and contaminants from salvage of the Golden Ray, each Defendant is liable to Plaintiffs in an amount to be determined at trial.

## COUNT V

### NEGLIGENCE UNDER FEDERAL MARITIME LAW AND GEORGIA STATE LAW

#### (AGAINST ALL DEFENDANTS)

169.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

170.    Plaintiffs allege claims for negligence and other causes of action under General Maritime law against Defendants for all damages recoverable under General Maritime law. All claims and causes of action asserted by Plaintiffs in this litigation are hereby supplemented with applicable Georgia state law causes of action where necessary

171.    All at times material hereto, Defendants were responsible for loading, and either owned, operated, managed, maintained and/or controlled the Golden Ray and all

-30-

resulting activities regarding its salvage.

172.    At all times material hereto, Defendants owed a duty to exercise reasonable care in the operation of the Golden Ray, including loading the vessel such that it would not capsize and wreck.

173.    Defendants breached that duty in failing to guarantee the stability of the vessel prior to departure from the Port of Brunswick.

174.    Defendants breached that duty in failing to conduct a proper stability calculation of the vehicle cargo onboard prior to departure from the Port of Brunswick.

175.    Plaintiffs allege that Defendants' acts and omissions, including any statutory or regulatory violations, were caused by the joint negligence and fault of Defendants and/or its agents, servants and/or employees, causing the vessel to be loaded top-heavy and sent underway in such an unstable condition.

176.    As a result of Defendants' negligence, the vessel became unstable and listed dramatically, forcing the State Pilot in a split-second decision to run the Golden Ray into a sandbar to avoid a collision with inbound vessel Emerald Ace and prevent shipwreck in deeper waters.

177.    Defendants' negligence caused environmental and economic harm to the Sound and the surrounding environment, affecting shrimping, fishing, and crabbing industries of which Plaintiffs are active participants.

178.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered property damages and economic damages in an amount to be determined at trial.

## COUNT VI

### NEGLIGENCE PER SE

(AGAINST ALL DEFENDANTS)

179.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

180.    Defendants' past and ongoing discharges of oil and other pollutants, and dumping of cars, car parts, and related materials and debris from the Golden Ray and subsequent salvage operations into the Sound and surrounding environment violated and continue to violate several statutes including sections 301 and 402 of the CWA as well as RCRA.

181.    Defendants' violations of the CWA and RCRA were intentional and/or the result of their failure to exercise ordinary care.

182.    The harm to Plaintiffs is the type of harm the statutes were designed to guard against, and Plaintiffs fall within the class of persons these statutes are intended to protect.

183.    Through violations of these statutes, Defendants breached duties owed to Plaintiffs.

184.    The violations of these statutes were the direct and proximate cause of damages to Plaintiffs in amounts to be proven at trial.

## COUNT VII

### PUBLIC NUISANCE

(AGAINST ALL DEFENDANTS)

185.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

186.   By discharging substantial quantities of fuel, oil, cars, car parts, materials, debris, and other hazardous substances, Defendants have created a condition that is harmful to health of the Sound, the surrounding rivers and marshlands, estuaries, and beaches, and interferes with Plaintiffs' use and enjoyment of these areas.

187.   Defendants' wrongful acts have created a continuing public nuisance in the form of the contamination of the waters of the St. Simon Sound, as well as the rivers, estuaries, creeks, and marshes adjacent thereto, and the poisoning of fish, shrimp, crabs, and other marine life.

188.   Defendants' wrongful acts have created a continuing public nuisance by blocking and interfering with the navigation through and around the Sound, including interfering with Plaintiffs' abilities to shrimp, crab, and travel through the Sound because of the presence of cars, car parts, materials, and other related debris.

189.   Defendants' acts and omissions, have created a continuing public nuisance that threatens the health, well-being, and safety of the people of Glynn County, including Plaintiffs, and its surrounding regions and continue to damage the property, the commerce, and the natural resources of Glynn County and its surrounding regions and harms all Plaintiffs herein.

190.   The Golden Ray wreckage, the EPB, 6,000 tons of rocks, Defendants' personnel and machinery involved in salvage efforts, substantial quantities of fuel, oil and other hazardous substances, incalculable amounts of debris from car parts and damaged portions of the Golden Ray dropped into the surrounding waters, and the fear of the presence

of oil and other hazardous substances have created conditions that have caused hurt, damage, and inconvenience to Plaintiffs' property, income, and shrimping and crabbing businesses.

191.    This nuisance affects business owners, like Plaintiffs, that rely on the safe and healthy environment.

192.    This nuisance also affects Plaintiffs' abilities to navigate and use the coastal waterways, including but not limited to Snag Alley for its shrimping and crabbing trawling and trapping practices.

193.    The capsize, salvage, and subsequent oil spills and other discharges are conditions that would reasonably annoy and disturb an ordinary person, as shown by, for example, Plaintiffs' inability to conduct shrimping and crabbing trawling and trapping in the coastal waterways, including Snag Alley, and the repeated damage and destruction of nets, boats and traps from contact with car parts, debris and oil and other hazardous substances discharged from the Golden Ray.

194.    This public nuisance created by the Defendants has caused and continues to cause damages to Glynn County, Georgia, the public at large, and Plaintiffs herein.

195.    This nuisance created and maintained by the Defendants has caused special damages to those who fish, shrimp, or crab, or wish to fish, shrimp, or crab in waters contaminated by the Defendants, and to those who otherwise have been specially damaged.

196.    The nuisance created by Defendants has caused special damage and injury to each Plaintiff and their businesses.

197.    The seriousness and gravity of the harm outweighs the social utility of

-34-

Defendants' conduct. There is no social utility associated with oil leakage and other discharges into the critical, coastal ecosystems.

198.    As a direct and legal cause of the Defendants' wrongful acts and/or omissions set forth herein, the Plaintiffs have and will suffer economic harm, injury, and losses.

199.    Plaintiffs, as citizens specially injured by the harmful acts of Defendants, have the right to seek the abatement of a public nuisance such as the one created, maintained, and continued by the Defendants, pursuant to O.C.G.A. § 41-2-2.

200.    Plaintiffs are entitled to an injunction directing the abatement of Defendants' wrongful pollution and enjoining the Defendants from continuing and maintaining the nuisance that pollutes and has polluted the waters, soils, marine life of the Sound, its rivers, estuaries, and adjacent marshlands, and the waters and marshlands adjacent thereto that are contaminated with oil from the shipwreck and subsequent leaks and debris contamination during the salvage operations.

201.    Unless the Defendants are ordered to remove all or substantially all of the oil, contaminants, and debris, each will continue to migrate into and within public waters and marshes and on to the lands of others, will continue to enter the food chain and be bioaccumulated and biomagnified in fish, birds, shrimp, crabs, animals and humans.

202.    Unless the Defendants are enjoined to remove the oil, cars, car parts, materials, debris, and other substances, such pollution will continue to migrate and continue to cause harm and threaten harm to the people, land, wildlife, and waters used and enjoyed by Plaintiffs in their business pursuits.

203.    Plaintiffs are entitled to an injunction to abate this nuisance by enjoining the Defendants to affirmatively remove all the oil and other hazardous substances, including cars, car parts, materials, and debris that have been wrongfully discharged into the Sound.

204.    Plaintiffs are entitled to their expenses of litigation, including reasonable attorney fees pursuant to O.C.G.A. § 13-6-11.

205.    Plaintiffs are entitled to damages, including exemplary damages sufficient to punish the Defendants and deter them from such further, similar wrongful conduct pursuant to O.C.G.A. § 51-12-5.1.

## COUNT VIII

### TRESPASS

(AGAINST ALL DEFENDANTS)

206.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

207.    Defendants' activities caused the vessel's capsizing and the discharging of fuel, oil, cars, car parts, materials, debris, and other hazardous fluids into the Sound and surrounding waterways, thereby damaging Plaintiffs personal property, including their vessels, mechanical systems, and equipment.

208.    It was reasonably foreseeable that loading a vessel in an unstable and top-heavy manner in violation of the 2008 Intact Stability Code, and also failing to engage the ballast system, would lead to a shipwreck and the resulting discharges of oil and other hazardous substances, including cars, car parts, materials, and debris.

209.    Defendants had a duty to use reasonable care not to interfere with Plaintiffs'

-36-

use of their personal property, including their vessels, mechanical systems, and equipment.

210. Defendants breached the duty they owed to Plaintiffs when they failed to exercise reasonable care in loading the Golden Ray, resulting in her capsizing, and the subsequent salvaging efforts.

211. Defendants knew or should have known that their conduct would foreseeably result in shipwreck and oil spills, causing damages to Plaintiffs' personal property and economic interest of persons in the area affected by the spills.

212. As a direct and proximate result of Defendants' trespass, Plaintiffs have suffered legal injury and damages in an amount to be proven at trial.

## COUNT IX

## DAMAGES NEGLIGENCE AND STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY

### (AGAINST T&T SALVAGE LLC)

213. Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

214. Defendant GLNV24 hired Defendant T&T for the large-section demolition and removal of the Golden Ray wreck.

215. Beginning in January 2020, Defendant T&T began its work and at all times relevant to this action, Defendant T&T had custody and control of the shipwrecked vessel and its contents.

216. Defendant T&T knew it was engaged in ultrahazardous activities, to wit: cutting up 656-foot-long capsized vessel containing 24 fuel tanks, thousands of gallons of unaccounted for fuel, and roughly 4,200 cars and trucks, which also contained gas and other

-37-

flammable, hazardous, and toxic fluids.

217.  Defendant T&T caused several fires, including those on January 20, 2020 and May 14, 2021, and several oil spills, including those on July 1 and July 30, 2021, into the Sound and surrounding environment; large amounts of debris from destroyed vehicles and other property connected with the Golden Ray were also dropped into the Sound during its removal and barging activities.

218.  The measures Defendant T&T implemented to contain the oil and other flammable, hazardous, and toxic substances and debris repeatedly failed.

219.  Plaintiffs have suffered harm from the discharges of oil, fuel and other hazardous substances and debris from these activities.

220.  The additional injuries sustained by Plaintiffs as a result of these repeated events were the direct and proximate result of Defendant T&T's negligent and grossly negligent failure to properly contain the oil and other flammable, hazardous and toxic substances of and in the ship, including debris lost while removing and barging sections to other locations.

221.  The harm to Plaintiffs is the kind of harm that would be reasonably anticipated as a result of the risks created by cutting up a partially submerged vessel containing flammable, hazardous, and toxic oil and other substances.

222.  Defendant T&T was the cause or a substantial factor in causing the damages suffered by Plaintiffs.

223.  Defendant T&T is liable for its negligence and gross negligence in these

activities, as well as strictly liable for these activities, and Plaintiffs are entitled to recover damages in an amount to be determined at trial.

## COUNT X

### PUNITIVE DAMAGES

(AGAINST ALL DEFENDANTS)

224. Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

225. Plaintiffs have repeatedly asked Defendants over the past year to cease their actions and clean up the Sound and surrounding environment, but Defendants have failed to take effective and appropriate action to remedy the situation and the ongoing damages.

226. Defendants' actions and inaction show willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which raises the presumption of conscious indifference to the consequences of such actions.

227. Defendants acted and failed to act with the specific intent to cause harm to Plaintiffs and their use and enjoyment of the Sound and surrounding environment such that there is no cap on the amount of punitive damages that a jury may impose in this case.

## COUNT XI

### ATTORNEYS' FEES AND EXPENSES OF LITIGATION

(AGAINST ALL DEFENDANTS)

228. Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 - 123.

229. Plaintiffs have repeatedly asked Defendants over the past year to cease their actions and clean up the Sound and surrounding environment, but Defendants have failed to

take effective and appropriate action to remedy the situation and the ongoing damages.

230.    Through this and other actions and omissions, Defendants acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11 such that attorneys' fees and expenses of litigation shall be allowed as part of the damages in this case.

231.    Through this and other actions and omissions, Defendants acted and/or failed to act with the specific intent to cause harm to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for this Court to:

A.    Grant Plaintiffs a trial by jury on all of their claims for relief;

B.    Enter judgment in favor of Plaintiffs on all of their claims for relief;

C.    Declare under the Federal Declaratory Judgment Act that Defendants are liable and/or derivatively liable for violations of §§ 301 and 402 of the CWA and of RCRA.

D.    Impose federal civil penalties against Defendants of $59,973 per violation of the CWA per day under § 505(a) of the CWA and $81,540 per violation of RCRA;

E.    Issue a temporary and/or permanent injunction ordering Defendants to cease their violations of the CWA and RCRA and immediately take all necessary steps to come into permanent and consistent compliance with the CWA and RCRA, and remove all pollutants from the Sound and surrounding

environment;

F.      Award Plaintiffs' attorneys' fees and expenses of litigation including expert witness fees under OPA, the CWA, and RCRA, and under O.C.G.A. § 13-6-11;

G.      Award Plaintiffs all recoverable past, present and future compensatory, statutory, and other damages, general and special to be proven at trial, including but not limited to damages under OPA, general maritime law, and Georgia law for natural resource damages, damages to personal property, loss of profits or impaired earning capacity, loss of subsistence use, and damage assessments;

H.      Enter an order that the Court shall maintain jurisdiction over this action until Defendants come into consistent and permanent compliance with the CWA and RCRA and comply with every order of this Court in this action including any consent decree entered by this Court; and

I.      Grant Plaintiffs such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable as a matter of right.

[SIGNATURES ON NEXT PAGE]

-41-

This _____ day of September, 2022.

BOYD LAW FIRM, LLC

By: _____
    Roy J. Boyd, Jr.
    Georgia State Bar No.: 072675
    Autumn N. Cocchi
    Georgia State Bar No.: 455387

1601 Reynolds Street
Brunswick, Georgia 31520
Telephone (912) 265-5069
Facsimile (912) 265-1209

STACK & ASSOCIATES, P.C.

By: /S/ Donald D J Stack
    Donald D. J. Stack
    Georgia State Bar No.: 673735

260 Peachtree Street, Suite 1200
Atlanta, Georgia 30303
Telephone (404) 525-9205
Facsimile (404) 522-0275

ATTORNEY FOR PLAINTIFFS

-42-

## VERIFICATION OF PLAINTIFF TOMMY CRUM

Personally appeared before me, an officer duly authorized by law to administer oaths, **TOMMY CRUM**, who states under oath that the facts contained within the foregoing Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
Tommy Crum

Sworn to and subscribed before me
this ⧵ day of September, 2022.

Notary Public

My Commission Expires:

HEATHER N. NESOM
Notary Public
WARE COUNTY, GEORGIA
My Commission Expires 04/02/2023

## VERIFICATION OF PLAINTIFF THE LITTLE LLOYD, LLC

Personally appeared before me, an officer duly authorized by law to administer oaths, **THE LITTLE LLOYD, LLC**, by and through authorized representative Tommy Crum, who states under oath that the facts contained within the foregoing Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

Tommy Crum *on behalf of The Little Lloyd, LLC*

Sworn to and subscribed before me
this 1 day of September, 2022.

Notary Public

My Commission Expires:

HEATHER N. NESOM
Notary Public
WARE COUNTY, GEORGIA
My Commission Expires 04/02/2023

## VERIFICATION OF PLAINTIFF NATHANIEL WESTON

Personally appeared before me, an officer duly authorized by law to administer oaths,

**NATHANIEL WESTON**, who states under oath that the facts contained within the foregoing

Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and

Expenses of Litigation are true to the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

Nathaniel Weston

Sworn to and subscribed before me
this 2 day of September, 2022.

Notary Public

My Commission Expires: June 17, 2024

SHAWNE R BAILEY
Notary Public - State of Georgia
Clayton County
My Commission Expires Jun 17, 2024

## VERIFICATION OF PLAINTIFF R/WES PROPERTIES, INC.

Personally appeared before me, an officer duly authorized by law to administer oaths,

**R/WES PROPERTIES, INC.**, by and through authorized representative Nathaniel Weston, who

states under oath that the facts contained within the foregoing Verified Complaint for Civil

Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to

the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

Nathaniel Weston *on behalf of R/WES*
*Properties, Inc.*

Sworn to and subscribed before me
this _2_ day of September, 2022.

Notary Public

My Commission Expires: June 17, 2024

SHAWNE R BAILEY
Notary Public - State of Georgia
Clayton County
My Commission Expires Jun 17, 2024

## VERIFICATION OF PLAINTIFF SANDY MARSH

Personally appeared before me, an officer duly authorized by law to administer oaths, **SANDY MARSH**, who states under oath that the facts contained within the foregoing Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to the best of her knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

Sandy Marsh

Sworn to and subscribed before me
this  1  day of September, 2022.

Notary Public

HEATHER N. NESOM
Notary Public
WARE COUNTY, GEORGIA
My Commission Expires:  My Commission Expires 04/02/2023

## **VERIFICATION OF PLAINTIFF WILLIAM BENNETT**

Personally appeared before me, an officer duly authorized by law to administer oaths, **WILLIAM BENNETT**, who states under oath that the facts contained within the foregoing Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
William Bennett

Sworn to and subscribed before me
this 2 day of September, 2022.

_____
Notary Public

My Commission Expires:

HEATHER N. NESOM
Notary Public
WARE COUNTY, GEORGIA
My Commission Expires 04/02/2023

## VERIFICATION OF PLAINTIFF BENNETT'S BAIT, LLC

Personally appeared before me, an officer duly authorized by law to administer oaths, **BENNETT'S BAIT, LLC**, by and through authorized representative William Bennett, who states under oath that the facts contained within the foregoing Verified Complaint for Civil Penalties, Injunctive Relief, Damages, and Attorneys' Fees and Expenses of Litigation are true to the best of his knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

William Bennett *on behalf of*
*Bennett's Bait, LLC*

Sworn to and subscribed before me
this 2 day of September, 2022.

Notary Public

My Commission Expires:

HEATHER N. NESOM
Notary Public
WARE COUNTY, GEORGIA
My Commission Expires 04/02/2023