# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

```
TOMMY CRUM, et al.            )
                             )
      Plaintiffs,            )
                             )
      v.                     )          2:22-CV-85
                             )
GL NV24 SHIPPING, INC.,      )
HYUNDAI GLOVIS CO.,          )
G-MARINE SERVICE CO., LTD,   )
NORTON LILLY                 )
INTERNATIONAL, INC.,         )
T&T SALVAGE LLC, AND         )
JOHN DOE ENTITIES 1          )
THROUGH 10,                  )
                             )
      Defendants.            )
```

## ORDER

This case arises from the capsize of the *M/V Golden Ray* ("Golden Ray" or "the vessel") in the St. Simons Sound. Tommy Crum and forty other plaintiffs ("Crum Plaintiffs"), dkt. no. 56 ¶¶ 7-46, all involved in Georgia's shrimping or crabbing industries, filed suit for damages sustained due to the capsize against (1) the vessel's owner, GL NV24 Shipping, Inc. ("GL NV24"); (2) the vessel's charterer, Hyundai Glovis Co. ("Hyundai Glovis"); and (3) the vessel's operator and technical superintendent, G-Marine Service Co., Ltd. ("G-Marine") (collectively "Vessel Defendants"); as well as (4) the vessel's agent, Norton Lilly International, Inc. ("Norton Lilly"); (5) the wreck removal company, T&T Salvage

LLC ("T&T"); and John Doe Entities 1 through 10, see generally id.
This Order addresses the Vessel Defendants' and Norton Lilly's
motions to dismiss. Dkt. No. 74 (Vessel Defendants); Dkt. No. 75
(Norton Lilly).

### BACKGROUND[1]

On September 7, 2019, the Golden Ray, a 656-foot-long car-
and truck- carrier, arrived at the Port of Brunswick in Brunswick,
Georgia. Dkt. No. 56 ¶¶ 1, 59. Hyundai Glovis managed and chartered
the Golden Ray. Id. ¶ 48. G-Marine acted as the operator and
technical superintendent "that managed the crew of the Golden Ray
and maintained responsibility for the safety management system on
the Golden Ray." Id. ¶ 49. Norton Lilly was the Golden Ray's agent
in the Port of Brunswick. Id. ¶ 50. "As the Golden Ray's agent,
Norton Lilly worked with the Golden Ray's crew to ensure cargo was
loaded safely and properly and that appropriate safeguards were in
place to ensure the safe transport from the Port of Brunswick to
its final destination." Id. ¶¶ 50, 65, 67-68.

Norton Lilly developed the vessel's preliminary load plan,
"which included compiling the proposed cargo to be loaded and
offloaded and determining whether there was enough room on board
the Golden Ray for the proposed cargo at each port with the

---

[1] At this stage, the Court must "accept as true all facts alleged
in the non-moving party's pleading, and . . . view those facts in
the light most favorable to the non-moving party." Perez v. Wells
Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

projected available space." Id. ¶ 67. Norton Lilly submitted the preliminary load plan to Hyundai Glovis and the chief officer. Id. ¶ 68.

The chief officer reviewed the preliminary load plan to estimate the cargo's weight, which he entered into the vessel's LOADCOM computer, "a stability computer used to calculate the ship's center of gravity." Id. ¶ 69. The chief officer also manually entered information about the vessel's ballast, fuels, and fresh water into the LOADCOM computer to calculate the ship's center of gravity, even though the computer could input this data accurately on its own. Id. ¶ 71. G-Marine, the Golden Ray's operator, did not provide a training program for the LOADCOM computer, and the chief officer had never previously used a LOADCOM computer. Id. ¶ 95. The Chief officer was given "a few hours" of training on the computer when he or she joined the Golden Ray crew. Id. G-Marine created a safety management system, which required the Golden Ray's master to approve the chief officer's LOADCOM calculations. Id. ¶ 73. The master did not do so, "thereby fail[ing] to take any corrective action to stabilize the vessel for its voyage." Id. ¶ 74.

On September 8, 2019, a little after 1:00 a.m., the Golden Ray left the Port of Brunswick, entering the St. Simons Sound. Id. ¶ 75. The vessel encountered "[c]upcake conditions"—"light south wind, calm, good visibility, [and] bright." Id. ¶ 79. The vessel

3

turned starboard, heading right and east out of the Sound. Id. ¶ 80.

The vessel then listed starboard. Id. ¶ 81. The captain was unable to right the vessel and it continued to spin starboard. Id. The vessel capsized with its portside down on the edge of the Sound, just northeast of Jekyll Island, Georgia. Id. ¶ 83. Its starboard side protruded from the water. Id.

"The area where the Golden Ray was grounded is colloquially known as 'Snag Alley' and serves as one of the prime locations for Georgia's commercial shrimping and crabbing industries' trawling and trapping practices." Id. ¶ 100. Moreover, the Golden Ray capsized "near environmentally sensitive areas that serve as a unique habitat for a variety of species, including, but not limited to, shrimp, fish, migratory birds, crabs, and food sources for all marine life, including, but not limited to, fiddler crabs." Id. ¶ 97. The coastal environment surrounding the capsize "is . . . the main attraction of tourism to the area and serves as the epicenter for Georgia's commercial shrimping and crabbing industries." Id. ¶ 98.

After it capsized, the vessel "immediately began" to leak fuel oil, and fires ignited that lasted for nearly twenty-four hours. Id. ¶¶ 84-85.

On September 23, 2019, the United States Coast Guard ("Coast Guard") reported that the ship was leaking "sporadic discharges"

of oil from its hull. Id. ¶ 88. The Coast Guard noted that oil was spotted on nearby shorelines, rivers, and marshes. Id. On October 1, 2019, more fuel was discharged, and the Jekyll Island Authority reported that "oil was observed on Jekyll Island beaches and nearshore waters." Id. ¶ 89.

The Coast Guard and the National Transportation Safety Board ("NTSB") conducted an investigation and hearing about the capsize. Id. ¶ 90. The entities concluded that the Golden Ray was "not in compliance with the 2008 Intact Stability Code because the vessel had too much cargo at a high center of gravity, a situation that could have been corrected by ballasting." Id. They also "determined that the vessel had been out of compliance with the 2008 Intact Stability Code during the two (2) prior port stops." Id. ¶ 91. The entities explained that these issues were caused by loading the vessel with too many vehicles at a high center of gravity, which rendered the vessel top-heavy and placed it in danger of capsizing. Id. ¶ 90-94.

On or about October 29, 2019, "in an attempt to stabilize the wreckage, Defendants caused over 6,000 tons of rocks to be dropped in Snag Alley and around the Golden Ray." Id. ¶ 101.

By December 12, 2019, approximately 320,000 gallons of fuel mixed with water were pumped out of the Sound. Id. ¶ 102. Approximately 44,000 gallons of "petroleum products, hazardous

substances, and 4,200 cars remained submerged in local waters."
Id.

In January 2020, T&T accepted responsibility for removing the
wreckage. Id. ¶ 105. T&T's Wreck Removal Plan was to mechanically
cut the vessel into eight large sections, which were to be removed,
and place an Environmental Protection Barrier ("EPB") to contain
the vessel's pollutants. Id. ¶ 106-07.

On January 19, 2020, another fire began on the vessel. Id.
¶ 110. On November 6, 2020, cutting and lifting operations began,
but the cutting chain broke within two days. Id. ¶ 112. "Repeated
fires causing additional discharges of debris and hazardous fluids
occurred throughout the duration of [the] wreck removal." Id.
¶ 113.

T&T put an EPB in place on June 1, 2020. Id. ¶ 111. Oil made
it past the EPB on three occasions, "allowing oil to infiltrate
the coastal wetlands, marshlands, estuaries, and beaches." Id. ¶
114. "This oil and other oil-based pollutants are likely to remain
suspended in the water column and embedded in the sediment for the
foreseeable future." Id. ¶ 115.

According to the complaint, the salvage operations resulted
in numerous cars, car parts, and other debris falling into the
Sound "where many remain, while others were carried off in the
currents." Id. ¶ 116. The various car parts and debris "have and
continue to wreak havoc on shrimping and crabbing operations . . .

as the debris prevents access to Snag Alley, and blocks and damages equipment utilized in these industries." Id. ¶ 126. Salvage operations finished in October 2021. Id. ¶ 117.

Between May 9, 2022, and June 3, 2022, Crum Plaintiffs—all "individuals and entities actively engaged in Georgia's tourism industry," id. ¶¶ 7–46—presented their OPA claims to GL NV24 and Hyundai Glovis Co. Id. ¶ 56. The presentments described the capsize and its impact on the claimants, stated sums which the claimants would accept for a general release of their claims, and explained how those sums were calculated. See generally Dkt. No. 78-1.

After the statutorily allotted time passed, Crum Plaintiffs filed suit against Vessel Defendants, Norton Lilly, T&T, and John Doe Entities 1 through 10. Dkt. No. 1. Vessel Defendants and Norton Lilly filed motions to dismiss. Dkt. No. 25; Dkt. No. 36. Crum Plaintiffs filed an amended complaint, dkt. no. 56, and the Court denied the motions to dismiss as moot, dkt. no. 59.

In their amended complaint, Crum Plaintiffs assert the following claims:

1. Strict liability under the Oil Pollution Act of 1990 ("OPA") (Count I), against GL NV24 and Hyundai Glovis, dkt. no. 56 ¶¶ 120–35;

2. Negligence under federal maritime law and state law against all Defendants (Count II), id. ¶¶ 136–45;

7

3. Negligence per se against all Defendants (Count III), id.
   ¶¶ 146-51;

4. Public nuisance against all Defendants (Count IV), id.
   ¶¶ 152-72;

5. Trespass against all Defendants (Count V), id. ¶¶ 173-79;

6. Negligence and strict liability for ultrahazardous activity
   against T&T Salvage (Count VI), id. ¶¶ 180-90.

Crum Plaintiffs also seek punitive damages, id. ¶¶ 191-94, as well
as attorneys' fees and expenses of litigation, id. ¶¶ 195-98.

Subsequently, Vessel Defendants and Norton Lilly filed
motions to dismiss Crum Plaintiffs' amended complaint. Dkt. No.
74; Dkt. No. 75. After briefing and oral argument, these motions
are ripe for adjudication.

**DISCUSSION**

**I.   OPA Presentment**

The Vessel Defendants[2] argue Crum Plaintiffs' presentments
are insufficient in two ways: (1) their presentments include both
OPA and non-OPA damages, and (2) their presentments fail to include
all the types of OPA damages they now assert in this suit. Dkt.
No. 74 at 7-10.

_____

[2] Crum Plaintiffs bring their OPA claim against only GL NV24 and
Hyundai Glovis, not G-Marine, dkt. no. 56 ¶¶ 120-35, but Vessel
Defendants filed their motion to dismiss collectively, dkt. no.
73. Thus, the Court refers to "Vessel Defendants" when discussing
the OPA claim, but it recognizes that G-Marine is not implicated
by this claim.

**A. Presentment of a sum certain**

33 U.S.C. Section 2713(a) provides, "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source." 33 U.S.C. Section 2701(3) defines "claim" as "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." The OPA does not further define "sum certain."

"It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute." Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., 51 F.3d 235, 237 (11th Cir. 1995) (first citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992); and then citing United States v. Kirkland, 12 F.3d 199, 202 (11th Cir. 1994)). "When interpreting the text, we give undefined terms their plain, ordinary, and most natural meaning." Id. (first citing Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995); and then citing Brown v. Gardner, 513 U.S. 115, 117–18 (1994)).

The plain and ordinary meaning of "sum certain" is a fixed amount of money. See Sum Certain, Black's Law Dictionary (11th ed. 2019) ("Any amount that is fixed, settled, or exact."); Sum and Certain, Merriam-Webster Unabridged (2023) (defining "sum" as "an indefinite or specific amount of money" and "certain" as "fixed, settled, stated"); Sum and Certain, Oxford English Dictionary (2023) (defining "sum" as "[a] quantity or amount of money" and

"certain" as "[d]etermined, fixed, settled; not variable or fluctuating; unfailing"). But this does not clarify what components may or must compose the fixed amount of money.

The Vessel Defendants argue that Crum Plaintiffs did not present a "sum certain" because the amounts they alleged are "lump sum[s] . . . that fail[] to specify the portion of the sum that constitutes OPA damages." Dkt. No. 74 at 9; Dkt. No. 86 at 3–5. The Vessel Defendants highlight a sentence from each of the presentments, which states: "[Claimant] submits this claim pursuant to the [OPA] and demand for monetary damages pursuant to well established state law on the creation and maintenance of a public nuisance." Dkt. No. 74 at 9 (quoting Dkt. No. 74-1 at 3).

Courts have looked to the Federal Tort Claims Act ("FTCA") for guidance in interpreting the OPA's "sum certain" requirement. See Honeywell Int'l Inc. v. Sunoco (R&M), LLC, No. 518CV1176FJSML, 2022 WL 899524, at *2 (N.D.N.Y. Mar. 28, 2022); Honeywell Int'l Inc. v. Citgo Petroleum Corp., 574 F. Supp. 3d 76, 83 (N.D.N.Y. 2021); Nodine v. Plains All Am. Pipeline, LP, No. 17-CV-163-SMY-DGW, 2018 WL 4636242, at *3 (S.D. Ill. Sept. 27, 2018). The FTCA, like the OPA, requires claim presentment in the form of "a claim for money damages in a sum certain." 28 C.F.R. § 14.2; see also 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the

10

appropriate Federal agency."); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency.").

In Sunoco, the District Court for the Northern District of New York evaluated the sufficiency of the plaintiff's OPA presentment based upon the Seventh Circuit's interpretation of the FTCA's sum certain standard. 2022 WL 899524, at *2. The Sunoco court explained,

> "OPA defines a 'claim' as 'a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident.'" "The OPA does not define the term 'sum certain.' However, the Seventh Circuit has addressed what is needed to satisfy the requirements for a 'sum certain' in the context of the Federal Tort Claims Act." "In Khan v. U.S., 808 F.3d 1169, 1172-73 (7th Cir. 2015), the Court noted, 'all that must be specified is "facts plus a demand for money;" if those two things are specified, "the claim encompasses any cause of action fairly implicit in the facts."'" "'But as "facts plus a demand for money" must be specified, failure to ask for any damages – any money – is fatal.'"

Id. (internal citations omitted) (alterations accepted); see also Citgo, 574 F. Supp. 3d at 83 (same); Nodine, 2018 WL 4636242, at *3 (using the "facts plus a demand for money" framework to evaluate whether the plaintiffs presented a sum certain).

Like the Seventh Circuit's "facts plus a demand for money" standard, the Eleventh Circuit has held that "[t]he FTCA's [presentment] requirement is satisfied if the claimant '(1) gives the agency written notice of his or her claim sufficient to enable

the agency to investigate and (2) places a value on his or her claim.'" <u>Brown v. United States</u>, 838 F.2d 1157, 1160 (11th Cir. 1988) (quoting <u>Adams v. United States</u>, 615 F.2d 284, 289 (5th Cir. 1980)). The Eleventh Circuit "has taken a somewhat lenient approach to the 'sum certain' requirement holding, for example, that even where a claimant had not specifically stated the value of the claim, attaching medical bills and repair estimates to the claim notice could suffice." <u>Tidd v. United States</u>, 786 F.2d 1565, 1567 n.6 (11th Cir. 1986) (first citing <u>Molinar v. United States</u>, 515 F.2d 246 (5th Cir. 1975); and then citing <u>Wardsworth v. United States</u>, 721 F.2d 503, 505–06 (5th Cir. 1983)); <u>see also</u> <u>Molinar</u>, 515 F.2d at 249 ("We are persuaded that plaintiff here has complied with the procedure for filing a claim. The letter of October 19, 1971, included bills which totaled $1462.50. This was a 'sum certain.' The testimony at trial by the reviewing officer that 'the figures here simply (gave) me no basis on which . . . to take any action' cannot overcome the presentation made by the bills themselves."); <u>Dalrymple v. United States</u>, 460 F.3d 1318, 1325 (11th Cir. 2006) (quoting <u>Tidd</u>, 786 F.2d at 1567 n. 6); <u>Turner ex rel. Turner v. United States</u>, 514 F.3d 1194, 1200 (11th Cir. 2008).

"However, '[the Eleventh Circuit] ha[s] held that the FTCA requires, at a minimum, that a claimant expressly claim a sum certain or provide documentation which will allow the agency to calculate or estimate the damages to the claimant.'" <u>Dalrymple</u>,

460 F.3d at 1325 (quoting Suarez v. United States, 22 F.3d 1064, 1066 (11th Cir. 1994)). In Tidd, the Eleventh Circuit favorably cited Wardsworth, 721 F.2d at 505-06, for its "discussi[on of the] sum certain requirement, and indicat[ion] that it could be met by merely providing the agency with facts from which it could estimate the value of the claim." Tidd, 786 F.2d at 1567 n.6.

Here, Nodine, 2018 WL 4636242, at *3, is particularly on-point. The Nodine plaintiffs—residents of the local area—presented aggregate damages of $16,916,645, comprised of $8,069,145 in "socioeconomic" and "environmental" damages and $8,069,145 in diminished property values. 2018 WL 4636242, at *3. The Nodine plaintiffs "detailed how the oil spill affected land use, property values, surface water and sediments, and soil and groundwater in the Highland community." Id. While the OPA permits landowners to recover damages for removal costs, 33 U.S.C. § 2702(b)(1)(B), "injury to, or economic losses resulting from destruction of, real or personal property . . . by a claimant who owns . . . that property," id. § 2702(b)(2)(B), or subsistence use of natural resources, id. § 2702(b)(2)(C), the OPA does not permit land-owning claimants to recover damages for injury to natural resources, costs of providing increased public services during removal activities, or any other "socioeconomic" damages that do not fall within Section 2702(b)'s specifically delineated categories. Thus, like Crum Plaintiffs, the Nodine plaintiffs

included both OPA and non-OPA damages in their presentment and estimated damages amount. 2018 WL 4636242, at *3. The <u>Nodine</u> court found the Seventh Circuit's FTCA "facts plus [a] demand for money" standard "instructive" and held that the presentment satisfied the OPA's sum certain requirement. <u>Id.</u> It explained, "[w]hile Defendants requested more specificity regarding Plaintiffs' claimed damages in subsequent letters, the OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually." <u>Id.</u>

Crum Plaintiffs' presentments, like the <u>Nodine</u> plaintiffs' presentment, includes both OPA and non-OPA damages. <u>See</u> Dkt. No. 78-1 at 2-129. Like in <u>Nodine</u>, including both OPA and non-OPA damages does not in and of itself render Crum Plaintiffs' presentments insufficient. Instead, Crum Plaintiffs' presentments easily satisfy the OPA's "sum certain" requirement, applying either the Eleventh Circuit's notice "sufficient to enable investigat[ion]" plus a "value" standard or the Seventh Circuit's "facts plus [a] demand for money" standard. Crum Plaintiffs' presentments, contrary to the Vessel Defendants' assertion, do not simply state a "lump sum." Dkt. No. 74 at 9. Instead, Crum Plaintiffs' presentments include facts about the wreck, its impact on the environment, and how this impacted the claimants. Dkt. No. 74-1 at 1-5; <u>see generally</u> Dkt. No. 78-1. Crum Plaintiffs also

14

include specific data about how the wreck impacted claimants'
businesses. <u>See, e.g.,</u> Dkt. No. 74-1 at 1–5. For example, Plaintiff
Tommy Crum included the following information in his presentment:[3]

> Tommy Crum is the owner of the shrimping boat The
> Little Lloyd LLC. Claimant Crum purchased the vessel
> from his father in March 2020, having worked on the
> vessel as a deckhand for years prior. Since the Golden
> Ray capsized, Claimant Crum has spent more than $108,000
> to repair damage caused by floating car parts and other
> debris. This includes the costs to replace and
> frequently repair The Little Lloyd's nets, the
> replacement of the clutch used to pull nets out of the
> water, and the labor and storage required to keep the
> boat out of the water while repairs are made. Invoices
> and receipts for repairs are attached as Exhibit "A."
>
> In addition to the costs to repair, net damage from
> car parts prevents Claimant Crum and his crew from
> shrimping for several days while the nets are repaired.
> Claimant Crum shrimps seven (7) days a week and typically
> only takes off 17–18 days per year. However, since March
> 2020, Claimant Crum has missed at least 90 days of
> shrimping while his boat was out of commission and being
> repaired. The boat often catches anywhere between 1,000
> to 4,000 pounds of shrimp per trip. This means that
> Claimant Crum was prevented from operating his business
> while the boat was being repaired, with a lost potential
> catch of at least 90,000 pounds of shrimp. Shrimp prices
> fluctuate between $1.50 and $9 per pound wholesale,
> depending on the size of the shrimp, meaning Claimant
> Crum and the Little Lloyd LLC have lost at least $135,000
> from the inability to shrimp and likely much more.
> Landings data kept by the Georgia Department of Natural
> Resources are included on the enclosed thumb drive as
> Exhibit "B."
>
> Claimant Crum can no longer shrimp in the area
> surrounding the Golden Ray due to the presence of oil,
> car parts, and debris in the water. Historically, this
> has been the most productive shrimping area in Glynn

_____

[3] The Vessel Defendants use Plaintiff Tommy Crum's presentment
letter as a sample letter because "[a]ll of the presentment letters
used the same format." Dkt. No. 73 at 9.

County for at least three (3) months out of the season. Now, Claimant Crum has to travel to other areas to shrimp during this period, which requires additional travel time, fuel, and ice. For example, Claimant Crum often shrimps off Cumberland Island, which adds 20-25 miles and four hours to his round-trip time. The Little Lloyd burns 18-20 gallons per hour for fuel, meaning the boat burns an additional 72 to 80 gallon per trip. At an average of $3.25 per gallon for diesel, Claimant Crum is spending an additional $234 to $260 per trip for fuel when traveling to Cumberland Island. Other times he has to travel as far as Fernandina Beach, Florida, which only increases his fuel costs. This means that during the 90-day period when Snag Alley would be most productive, Claimant Crum is spending at least an additional $21,060-$23,400 for fuel to travel to other areas.

Finally, Claimant Crum is concerned about the long-term impacts oil will have on the shrimp population in the Glynn County area. Even though the vessel has been removed, and even if the remaining cars and car parts are removed, oil and other pollutants will remain embedded in the sediment in the Sound and will continue to harm future shrimp populations. Claimant Crum is already feeling the effects as production in 2021 was down from 2020. Normally, fall, particularly September, is the most productive shrimping season. However, production was significantly reduced in 2021 as the salvaging operations and oil discharges continued. In September 2020, the Little Lloyd caught nearly 15,000 pounds within the first week or so of the month. In September 2021, on the other hand, the boat pulled in less than 15,000 within the first three weeks of the month. The reduced numbers can be attributed to oil as the boat caught shrimp completely covered in oil several times in 2021. An oil sheen was also regularly observed on the water in the vicinity of the capsized Golden Ray.

Id. at 3-4.

Plaintiff Tommy Crum sought $632,157.92 "for a general release of his claims." Id. at 4. He explained in detail how he calculated this number:

16

This amount includes reimbursement of $177,840, which includes $66,690 (the average of $63,180 and $70,200) for increased fuel costs to avoid Snag Alley due to the presence of oil for three (3) month periods in 2019, 2020, and 2021, plus an additional $22,230 per year (the average of $21,060 and $23,400) for fuel for the next five (5) years. This settlement amount also includes $108,257.76 as reimbursement for the out-of-pocket expenses incurred in servicing and repairing The Little Lloyd due to damage from car parts. This amount further includes $135,000 for lost revenue from decreased landings because of downtime since September 2019 plus $10,000 per year for the next five (5) years due to the presence of oil and contamination. The amount includes $61,059.53 for reimbursement of expert costs for sampling and lab testing to determine the impacts of oil on the St. Simons area. Finally, this amount includes an additional $100,000 for compensation for Claimant Crum's annoyance and inconvenience and for his attorney's fees and expenses unrelated to sampling.

Id.

This presentment is far more detailed than the presentment that the court found satisfactory in Nodine. Plaintiff Tommy Crum's presentment provides enough detail such that Vessel Defendants could easily understand the basis for his claims. Id. at 1–4. It clearly explains how he calculated the total sum sought and provides a corresponding monetary value for each type of damages he mentions. Id. at 3. His presentment included more detail than he had to provide under the sum certain standard, see Nguyen, 805 F.3d at 141, and it undoubtedly provided the Vessel Defendants enough information "to calculate or estimate the damages" they believed would comprise a fair settlement amount, Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22 F.3d at 1066); Nodine, 2018 WL

4636242, at *3 ("[T]he OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually."). Thus, like the _Nodine_ plaintiffs' presentment, which was sufficient despite including both OPA and non-OPA damages, Crum Plaintiffs' presentment was sufficient despite including OPA and non-OPA damages. The other Plaintiffs' presentments follow a similar pattern and satisfy the OPA presentment requirement for the same reasons. _See_ Dkt. No. 78-1 at 2-107, 113-29.

The Vessel Defendants try to distinguish _Nodine_, arguing that in that case "there was no indication (much less an express assertion) that claimants' presentments included claims under both OPA and state law." Dkt. No. 86 at 5 (citing _Nodine_, 2018 WL 4636243, at *2-3). But this only further supports that Crum Plaintiffs' presentments were sufficient. Crum Plaintiffs explicitly stated that the presentment included OPA and non-OPA claims, enumerated each type of claim, and provided a corresponding monetary value, while the _Nodine_ plaintiffs sought recovery of non-OPA damages without stating that they were not covered by the OPA, specifically delineating them, or providing a monetary value associated with them. Crum Plaintiffs' presentment provided clearer notice to the Vessel Defendants and made it much easier for them to conduct their own investigation than the _Nodine_ plaintiffs' presentment. _See Brown_, 838 F.2d at 1160 (explaining

18

that the FTCA presentment requirement is satisfied by notice sufficient to enable investigation and an associated monetary value). Thus, the Vessel Defendants' attempt to distinguish <u>Nodine</u> only further supports the sufficiency of Crum Plaintiffs' presentment.

The Vessel Defendants seem to argue that Crum Plaintiffs should have specifically labeled which damages were OPA damages and which damages were not. Dkt. No. 74 at 7–9. But "the OPA merely requires claimants to 'present all claims and damages' to the responsible party; the statute does not require claimants to itemize damages individually." <u>Nodine</u>, 2018 WL 4636242, at *3. Yet, here, Plaintiff Crum *did* individually itemize his damages, he simply did not label which damages were OPA damages and which were not. Dkt. No. 74-1 at 1–5. Calculating a number that represented only OPA damages would not have presented any difficulty for the Vessel Defendants because Plaintiff Crum provided a corresponding monetary value for each type of damages he sought. <u>Cf.</u> <u>Brown</u>, 838 F.2d at 1160 ("The FTCA's filing requirement is satisfied if the claimant '(1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'" (quoting <u>Adams</u>, 615 F.2d at 289)). Rejecting Crum Plaintiffs' presentment for something the Vessel Defendants could have easily ascertained would go directly against the Seventh and Eleventh Circuit's FTCA "sum certain" precedent.

Thus, Crum Plaintiffs' presentments satisfied the OPA "sum certain" requirement.

The purpose of the OPA's presentment procedure further supports that Crum Plaintiffs' presentment was sufficient. In Brown, 838 F.2d at 1160, the Eleventh Circuit explained that "[t]he congressional purposes of the [FTCA presentment] claim procedure are 'to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.'" Id. (quoting Adams, 615 F.2d at 288). The court continued, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Id. at 1161. Thus, "[c]ompelling a claimant to advance all possible causes of action and legal theories is 'overly technical' and may frustrate the purpose of [the presentment procedure]." Id. (quoting Mellor v. United States, 484 F. Supp. 641, 642 (D. Utah 1978)).

Several courts have recognized that Congress crafted the OPA presentment procedure "to promote settlement and avoid litigation," purposes very similar to those of the FTCA presentment procedure. Nguyen, 805 F.3d at 138 (quoting Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 310 (E.D. Va. 1993)); Abundiz v. Explorer Pipeline Co., No. Civ.A. 300CV2029H, 2003 WL 23096018, at *3 (N.D. Tex. Nov. 25, 2003); Gabarick, 2009 WL 102549, at *3; Turner v. Murphy Oil USA, Inc., No. CIV.A. 05-4206, 2007 WL

20

4208986, at *2 (E.D. La. Nov. 21, 2007); Marathon Pipe Line Co. v. LaRoche Indus. Inc., 944 F. Supp. 476, 479 (E.D. La. 1996). The OPA, like the FTCA, requires claimants to present *claims* prior to filing suit, and, as the Eleventh Circuit noted, "[a] 'claim' is not synonymous with a 'legal cause of action.'" Brown, 838 F.3d at 1061. Rejecting Crum Plaintiffs' OPA cause of action simply because they did not label which damages they brought under OPA and which they did not—when ascertaining this information presented very little difficulty to the Vessel Defendants—would be "overly technical." Id. Holding claimants to such high standards "may frustrate the purpose" of the OPA presentment procedure by encouraging defendants to litigate a presentment's sufficiency rather than investigating the merit of the claimant's claims and seeking to reach a settlement. While "'vague notions' about a statute's overall purpose cannot be allowed 'to overcome the words of its text regarding the *specific* issue under consideration,'" as discussed, the OPA's text does not address the specific issue under consideration—what constitutes a "sum certain"—and relevant persuasive precedent also supports that Crum Plaintiffs' presentments included "sum[s] certain." Boca Ciega, 51 F.3d at 238 (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 261–62 (1993)).

Vessel Defendants cite Sunoco, 2022 WL 899524, at *3, and Citgo, 574 F. Supp. 3d at 83–84, for the proposition that a "claimant cannot present a lump sum amount which includes both OPA

and non-OPA damages." Dkt. No. 74 at 9. In Sunoco and Citgo, the courts applied the Seventh Circuit's "facts plus a demand for money" standard and found the plaintiffs' presentments inadequate. Sunoco, 2022 WL 899524, at *2–3; Citgo, 574 F. Supp. 3d at 83–84. The presentments failed to mention the "OPA anywhere in the document" and "provide[d] a sum, . . . [but] [d]id not indicate how [the] sum would be allocated between the various types of claims—CERCLA, OPA, and state law—that [the] [p]laintiff assert[ed] against [the] [d]efendants." Sunoco, 2022 WL 899524, at *3.

In contrast, Crum Plaintiffs' presentments repeatedly invoked the OPA. Dkt. No. 74-1 at 1, 4; see generally Dkt. No. 78-1. As discussed, supra pp. 15–19, they also satisfied the "facts plus a demand for money" standard. While the Sunoco and Citgo presentments did not "indicate" how the sums were allocated, Crum Plaintiffs' presentments explained in detail how the sum was calculated and provided more than enough detail to allow the Vessel Defendants to conduct their own investigation and valuation. Dkt. No. 73-1 at 3. Thus, applying the same "facts plus a demand for money" standard that the courts used in Sunoco and Citgo results in a different outcome in this case.

Other cases where courts have found presentments lacking are similarly distinguishable. In Johnson, 830 F. Supp. at 311, the presentment "d[id] not give any suggestions as to the amount of

damages [the plaintiffs were] claiming." See also Murphy Oil USA, 2007 WL 4208986, at *2 (holding that the plaintiffs' initial class action did not provide sufficient claim specificity to satisfy the OPA presentment requirement). Here, Crum Plaintiffs' presentment claimed a specific amount of damages, provided corresponding monetary amounts for each type of damages sought, and explained how the sums were calculated. In Abundiz, 2002 WL 2030880, at *3–4, the court held that the plaintiffs "failed to allege a sum certain for the damages sustained by any of the [p]laintiffs" because the plaintiffs' stipulation and settlement offer contained different amounts. Id. at *4. "[T]he settlement offer [was] in excess of the stipulation," so the defendant "could not have negotiated meaningfully with the [p]laintiffs." Id. Here, Crum Plaintiffs' presentments provided detail and uncontradicted monetary estimates such that the Vessel Defendants could have negotiated meaningfully. See generally Dkt. No. 78-1.

At bottom, Crum Plaintiffs' presentments comport with the OPA's text, satisfy the Eleventh Circuit and Seventh Circuit FTCA "sum certain" standards, and are consistent with the OPA's purpose. Therefore, the Vessel Defendants' argument that the presentment is insufficient for presenting a lump sum with both OPA and non-OPA damages fails.

**B. Presentment of all claims**

The Vessel Defendants next argue that Crum Plaintiffs' presentments fail because they assert damages in the amended complaint that they do not raise in their presentments. Dkt. No. 74 at 9; Dkt. No. 86 at 5–6. Specifically, the Vessel Defendants argue that Crum Plaintiffs seek to recover subsistence use damages and natural resource damages, which, according to the Vessel Defendants, Crum Plaintiffs did not mention in their presentments. Dkt. No. 74 at 9. The Vessel Defendants also note that some of the Crum Plaintiffs failed to raise property damages because "only 17 out of 40 Plaintiffs included descriptions of property damage in their presentments." Id.

To begin, Crum Plaintiffs assert that they "have never sought and are not seeking natural resources damages." Dkt. No. 78 at 16. However, the amended complaint references "natural resource" damages. See Dkt. No. 56 ¶¶ 125–26, 130, 132–33 ("As a result of the oil spill, the Plaintiffs [have] not been able to use natural resources, such as the marshes, rivers, beaches, estuaries, parks, fish, shrimp, crab, water and potentially other areas and spaces, that have become contaminated by the spilled oil and other contaminants, and Plaintiffs are entitled to recover from Defendants for such damages and loss of use." (citing 33 U.S.C. § 2702(b)(2))). Thus, the Court **GRANTS** the Vessel Defendants' motion to dismiss, dkt. no. 74, as to natural resource damages to

24

the extent the amended complaint seeks to recover these damages. As a result, the Court need not address the Vessel Defendants' other arguments as to these damages. Dkt. No. 74 at 10–14.

The Court next evaluates Crum Plaintiffs' claims for subsistence use damages and property damages. For the reasons discussed, supra pp. 19–22, a claimant need not specifically label each type of OPA damages sought. So long as the presentment "specifie[s]" "facts plus a demand for money," "the claim encompasses any cause of action fairly implicit in the facts." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172–73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172–73). Thus, the Court must examine whether damages related to lost profits and earning capacity, as well as damages related to increased public services, are "fairly implicit" in Crum Plaintiffs' presentment. Id.

### i.  Subsistence use damages

Subsistence use damages are not "fairly implicit" in Crum Plaintiffs' presentments. Id. Subsistence use damages are "[d]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources." 33 U.S.C. § 2702(C). These damages "relate[] to use of a natural resource, such as water, to obtain the minimum necessities for life." Petition of

Cleveland Tankers, Inc., 791 F. Supp. 669, 678 & n.7 (E.D. Mich. 1992). Subsistence use does not include using a natural resource to conduct a business activity. See id. at 678 ("Contrary to the claimants' assertion, they did not use the river for 'subsistence use'—such term relates to use of a natural resource, such as water, to obtain the minimum necessities for life. The claimants seek to stretch the term well beyond its plain meaning to include as 'subsistence' any business activity." (footnote omitted)); Sekco Energy, Inc. v. M/V MARGARET CHOUEST, 820 F. Supp. 1008, 1015 (E.D. La. 1993) ("Plaintiff did not make 'subsistence use' of natural resources. . . . Rather than using natural resources in this manner, plaintiff had a commercial purpose in drilling for hydrocarbons.").

Crum Plaintiffs argue, "[w]hile the business-entity Plaintiffs may not be able to recover subsistence use damages, the individual plaintiffs did not have to spell it out that they eat shrimp and crabs to properly assert a claim for subsistence use damages." Dkt. No. 78 at 19. While Crum Plaintiffs did not have to specifically use the words "subsistence use damages," they did have to include facts in their presentments sufficient to make subsistence use damages "fairly implicit" in the presentment or to provide notice "sufficient to enable [the defendant] to investigate." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172–73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808

F.3d at 1172–73); Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22 F.3d at 1066). Crum Plaintiffs' presentments did not do so.

The presentments contain no facts relating to the claimants' subsistence use based on the shrimp and crabs they harvest nor how and to what extent the wreck impacted their subsistence use. Dkt. No. 78-1 at 2–129. Instead, these presentments contain facts and monetary values solely related to the wreck's impact on claimants' livelihoods, which are not recoverable as subsistence use damages. Cleveland Tankers, 791 F. Supp. at 678; Sekco Energy, 820 F. Supp. at 1015.

In Nguyen, 805 F.3d at 141, the court found the plaintiff fishermen's presentment letters sufficient, including their claims for subsistence use damages. In that case, the claimants' presentment letters "stated that as a result of the pollution discharge, the fishermen suffered losses in . . . subsistence use of harvested sea life" and "alleged a loss of $60 per day in subsistence use of natural resources." Id. at 136. The court held that this information was sufficient to satisfy the presentment requirement; the claimants did not have to provide additional information such as "an explanation of how the $60 in subsistence loss was calculated." Id. at 137, 141.

Unlike the plaintiffs in Nguyen, Crum Plaintiffs' presentments do not contain any facts indicating that the claimants suffered subsistence use losses—or even a statement that they

suffered such losses, without further elaboration, such as the Nguyen plaintiffs presented. Moreover, nowhere in Crum Plaintiffs' detailed explanations of the amount of damages sought and how those damages were calculated do the presentments allude to subsistence use damages. Under Nguyen, had Crum Plaintiffs merely stated that they suffered subsistence use damages and attached a monetary value, they could have satisfied the presentment requirement. Because Crum Plaintiffs fail to satisfy even this lenient standard, subsistence use damages were not "fairly implicit" in their presentments nor did their presentments provide notice "sufficient to enable [the defendant] to investigate." Sunoco, 2022 WL 899524, at *2 (quoting Khan, 808 F.3d at 1172–73); Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172–73); Dalrymple, 460 F.3d at 1325 (quoting Suarez, 22 F.3d at 1066). Since Crum Plaintiffs failed to present their claims for subsistence use damages, they may not now assert them in this litigation. Boca Ciega, 51 F.3d at 240 (holding that the OPA presentment requirement is a mandatory condition precedent).[4] Because Crum Plaintiffs' subsistence use

---

[4] As a separate ground for dismissal, Vessel Defendants argue that the nine juridical Plaintiffs in this case "cannot legally recover subsistence use damages." Dkt. No. 74 at 10 (citations omitted). As mentioned, "subsistence use" damages "relate[] to use of a natural resource, such as water, to obtain the minimum necessities for life." Petition of Cleveland Tankers, 791 F. Supp. at 678 & n.7 (citing Webster's Ninth New Collegiate Dictionary, 1176 (1986)); Sekco Energy, 820 F. Supp. at 1015. The juridical-Plaintiffs, as legal fictions created to operate business, do not have "life" or the "necessities of life." Thus, Crum Plaintiffs'

damages claims fail for lack of presentment, the Court need not address the Vessel Defendants' other arguments related to these damages. Dkt. No. 74 at 10–14. Thus, the Court **GRANTS** the Vessel Defendants' motion to dismiss, dkt. no. 74, as to subsistence use damages under the OPA.

### ii. Property damages

Vessel Defendants contend that the Court must dismiss property damage claims of twenty-three Plaintiffs who, they allege, failed to include "descriptions of property damage in their presentments." Dkt. No. 74 at 9. Vessel Defendants point to Plaintiffs (1) Benito Rodriguez; (2) Bennet Paniagua; (3) Daryle Brinson; (4) Dudley Williams; (5) Line Sink, Inc.; (6) Joseph Rauls; (7) Miss Bernadette, LLC; (8) Walter Mason; (9) William McClain; (10) Alonzo Griffin; (11) Bernard Paniagua; (12) David Marsh; (13) George Ormond; (14) Leslie Jacobs; (15) Michael Younce II; (16) Paul Robinson; (17) Richard Skinner;(18) Amber Waves, Inc.; (19) Sandy Marsh; (20) Thurmond Kent; (21) William Bennett; (22) Bennett's Bait, LLC d/b/a George's Bait ("George's Bait"); (23) and Willie Davis. Id. at 9–10 n.5.

33 U.S.C. Section 2702(b)(2)(B) defines damages to real or personal property as "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property, which

claim for subsistence use damages under the OPA also merits dismissal on this ground as to its nine juridical Plaintiffs.

shall be recoverable by a claimant who owns or leases that property." All Plaintiffs to whom Vessel Defendants point include descriptions of property damages. The presentments from Plaintiffs Alonzo Griffin, dkt. no. 78-1 at 4; Benito Rodriguez, id. at 8; (2) Bennet Paniagua, id. at 12; Bernard Paniagua, id. at 16; David Marsh, id. at 32; (4) Dudley Williams, id. at 36; (5) Line Sink, Inc., id.; George Ormond, id. at 40;(6) Joseph Rauls, id. at 60; (7) Miss Bernadette, LLC, id.; Leslie Jacobs, id. at 69; Michael Younce II, id. at 73; Paul Robinson, id. at 81; Richard Skinner, id. at 86; Amber Waves, Inc., id.; Thurmond Kern, id. at 106; (8) Walter Mason, id. at 115; (9) William McClain, id. at 123; and Willie Davis, id. at 127, all contain the following language:

> [S]hrimpers can no longer shrimp in [Snag Alley] without pulling up car parts from the Golden Ray in their nets. This has created a public nuisance as defined by O.C.G.A. § 41-1-2. These car parts oftentimes cause significant damage to the nets themselves and the mechanical systems that pull the nets in.

Damage to nets and mechanical systems constitutes "injury to . . . personal property." 33 U.S.C. § 2702(b)(2)(B);[5] cf. Nguyen, 805 F.3d at 136, 141 (presentment letter stating that "as a result of the pollution discharge, the fishermen suffered losses in . . . subsistence use of harvested sea life" was sufficient to claim

---

[5] Whether each of these Plaintiffs qualifies as someone who "own or leases" the boat under 33 U.S.C. Section 2702(b)(2) is an issue that Vessel Defendants did not raise and is best left for discovery.

subsistence use losses). While the claimants refer to O.C.G.A. Section 41-1-2, this does not prevent Plaintiffs from recovering property damages under the OPA. Through the quoted language, Plaintiffs "specified . . . facts" that made property damage "fairly implicit," Citgo, 574 F. Supp. 3d at 83 (quoting Khan, 808 F.3d at 1172-73), and provided "notice . . . sufficient to enable [Vessel Defendants] to investigate," Brown, 838 F.2d at 1160. Thus, these Plaintiffs include sufficient "descriptions of property damage in their presentments" to satisfy the OPA presentment requirement. Dkt. No. 74 at 9.

Several Plaintiffs include additional facts relating to damage to nets and boats. Plaintiffs Alonzo Griffin states in his presentment:

> Claimant has been a commercial shrimper for more than 50 years. He previously worked as a deckhand on the Bernese II owned by Andy Ross and the Lady Raven owned by Thurmond Kern. Both the Bernese II and the Lady Raven shrimp in the St. Simons Sound near the Golden Ray. However, since the Golden Ray capsized, the boats have been forced to avoid the area because of the frequency in which they pulled up car parts in their nets. These car parts rip and tear the nets and take two (2) to three (3) days to repair. There were many instances where the boats, particularly the Lady Raven, were inoperable because of torn nets. Sometimes, Claimant and other deckhands could repair the nets themselves. Other times, the entire net had to be replaced because of severe damage.

Dkt. No. 78-1 at 4. Plaintiffs Bernard Paniagua; David Marsh; George Ormond; Leslie Jacobs; Michael Younce II; Paul Robinson; Richard Skinner; Amber Waves, Inc.; Thurmond Kern; and Willie Davis

similarly mention damaged boats or nets in their presentments. Dkt. No. 78-1 at 16-17 (Plaintiff Bernard Paniagua) ("Claimant is a crewmember on the shrimp boat the Jo Ann B, owned by Joseph Williams. The boat's income is split 70/30, with 70% going to the boat. The remaining 30% is then divided equally among crewmembers working at the type, typically three (3), including Claimant. . . . Unfortunately, car parts and debris are not always avoidable. Despite the crew's best efforts, the Jo Ann B regularly pulls in car parts which damage the boat's nets and prevent the boat from shrimping while it is being repaired. Typically, net repairs take half to a full day."); id. at 32-33 (Plaintiff David Marsh) ("Claimant is the captain of Tommy Crum's boat, the Little Lloyd. . . . Net damage from car parts has prevented Claimant from shrimping for many days while the Little Lloyd's nets were repaired. . . . 50% of the profits go to the boat and the other 50% goes to the crew."); id. at 40 (Plaintiff George Ormond) ("Even after more than two and a half years, Claimant still pulls car parts into his nets nearly every trip. These parts typically get lodged in the boat's turtle excluder and cause Claimant to lose his entire catch. Oftentimes, Claimant will not know about these car parts until he completes a drag. This means he loses his entire catch and wastes several hours dragging while his nets are inoperable."); id. at 69 (Plaintiff Leslie Jacobs) ("Claimant is the owner and captain of the shrimp boat The Liberty Bell. . . .

32

Claimant has always shrimped in Snag Alley where the Golden Ray capsized. However, he now pulls up car parts, including bumpers and tires, nearly every time he shrimps. This requires him to stop shrimping until the parts can be removed and the repairs are made. To avoid pulling up parts, Claimant now shrimps near the shore and banks of the St. Simons Sounds, which means he can no longer target schools of shrimp. This, along with the downtime caused by damage from car parts and debris, has greatly reduced his income.); id. at 73 (Plaintiff Michael Younce II) ("Even if Claimant can find work, car parts and other debris often prevent shrimp from entering nets, which cut into his share of profits. Other times, these parts tear the nets and require frequent repairs that further decreased profitability."); id. at 81–82 (Plaintiff Paul Robinson) ("Claimant is a crewmember on the shrimp boat the Jo Ann B, owned by Joseph Williams. The boat's income is split 70/30, with 70% going to the boat. The remaining 30% is then divided equally among the crewmembers working at the time, typically three (3), including Claimant. . . . Unfortunately, [while shrimping] car parts and debris are not always avoidable. Despite the crew's efforts, the Jo Ann B regularly pulls in car parts which damage the boat's nets and prevent the boat from shrimping while it is being repaired. Typically, net repairs take a half to a full day.); id. at 86 (Plaintiff Richard Skinner and Plaintiff Amber Waves, Inc.) ("Claimant Skinner is a shrimper and owner of a 50ft shrimp boat

called Amber Waves. . . Since the Golden Ray capsized, the Amber Waves' nets snag on car parts and debris and tear frequently, which forces Claimant Skinner to end his trip and return to the dock so that the nets can be repaired."); id. at 106 (Plaintiff Thurmond Kern) ("Claimant is the owner and captain of the shrimp boat the Lady Raven. . . . Claimant often pulls in car parts like bumpers and seats that tear holes in the boat's nets. Once torn, Claimant cannot shrimp until he purchases webbing and repairs the nets himself. Not only does Claimant lose valuable shrimping time, he is forced to incur out-of-pocket expenses to make repairs."); id. at 127–28 (Plaintiff Willie Davis) ("Claimant is a crewmember on the shrimp boat Jo Ann B, owned by Joseph Williams. The boat's income is split 70/30, with 70% going to the boat. . . . Unfortunately, [while shrimping] car parts and debris are not always avoidable. Despite the crew's efforts, the Jo Ann B regularly pulls in car parts which damage the boat's nets and prevent the boat from shrimping while it is being repaired."). Thus, Plaintiffs Bernard Paniagua; David Marsh; George Ormond; Leslie Jacobs; Michael Younce II; Paul Robinson; Richard Skinner; Amber Waves, Inc.; Thurmond Kern; and Willie Davis include "descriptions of property damage in their presentments." Dkt. No. 74 at 9. This further refutes Vessel Defendants' contention that these Plaintiffs failed to include "descriptions of property damage in their presentments." Dkt. No. 74 at 9.

34

Similarly, Plaintiff Daryle Brinson states in his presentment: "[m]any crabbers no longer crab in [Snag Alley] after losing dozens of traps that became entangled in car parts and debris from the Golden Ray." Dkt. No. 78-1 at 29. As with other Plaintiffs, he states this in the context of discussing a "public nuisance as defined by O.C.G.A. § 41-1-2," id., but, as with other Plaintiffs, this does not render his presentment of OPA property damages insufficient, supra pp. 31–32. Losing crab traps can qualify as "injury to, or . . . destruction of . . . personal property." 33 U.S.C. § 2702(b)(2)(B). This further refutes Vessel Defendants' contention that these Plaintiffs failed to include "descriptions of property damage in their presentments." Dkt. No. 74 at 9. Thus, Plaintiff Daryle Brinson "include[s] descriptions of property damage in [his] presentment[]." Id.

Plaintiffs Sandy Marsh, William Bennett, and George's Bait similarly "include[] descriptions of property damage in their presentments." Id. Plaintiffs Sandy Marsh and William Bennett co-own George's Bait. Dkt. No. 78-1 at 89, 118. Plaintiff Sandy Marsh and George's Bait state in their joint presentment:

> Live shrimp are stored in live wells that use water pumped up from a creek behind the business. This tidal creek flows into the McKay River, which flows to the Sound.
>
> Over the past two and half [sic] years, Claimant Marsh and Mr. Bennett have regularly observed an oil sheen on the water behind their bait store. A photograph of this sheen is attached as Exhibit "B." This contaminated

> water, which is pumped into the live wells, has caused
> George's Bait to lose between 20 to 40 quarts of live
> shrimp per day during 2021. . . [L]ogs . . . indicate
> that Claimant Marsh and Mr. Bennett had to regularly
> drain and scrub their tanks to try to remove
> contaminants.

Id. at 90. Plaintiff William Bennett includes an almost identical

description in his joint presentment with George's Bait. Id. at

119 ("Live shrimp are stored in live wells that use water pumped

up from a creek behind the business. This tidal creek flows into

the McKay River, which flows to the St. Simons Sound. Over the

past two and half [sic] years, Claimant Bennett and Ms. Marsh have

regularly observed an oil sheen on the water behind their bait

store. A photograph of this sheen is attached as Exhibit 'C.' This

contaminated water, which is pumped into the live wells, has caused

George's Bait to lose between 20 to 40 quarts of live shrimp per

day during 2021. . . [L]ogs . . . indicate that Claimant Bennett

and Ms. Marsh had to regularly drain and scrub their tanks to try

to remove contaminants."). Death of shrimp they own and damage to

their tanks constitute "injury to . . . personal property." 33

U.S.C. § 2702(b)(2)(B). Thus, Plaintiffs Sandy Marsh, William

Bennett, and George's Bait include "descriptions of property

damage in their presentments" sufficient to satisfy the OPA

presentment requirement. Dkt. No. 74 at 9. In conclusion, all

disputed Plaintiffs' presentments, see id. at 9–10 n.5, "include[]

descriptions of property damages in their presentments," id. at 9.

Thus, Vessel Defendants' motion to dismiss these Plaintiffs' claims for property damages under the OPA, dkt. no. 74, is **DENIED**.

## II. Displacement and preemption

While "'[p]reemption' and 'displacement' are often used interchangeably," they are distinct concepts. United States v. Am. Com. Lines, LLC, 759 F.3d 420, 422 (5th Cir. 2014). Indeed, some of the cases cited herein use these terms interchangeably. "[P]reemption refers to whether federal statutory law supersedes state law, while 'displacement' applies when . . . a federal statute governs a question previously governed by federal common law." Id. The Vessel Defendants' argument implicates displacement: whether the OPA displaces Crum Plaintiffs' federal maritime claims. Dkt. No. 74 at 11–16 ("[Crum Plaintiffs'] federal maritime law claims are barred by preemption."). In contrast, Norton Lilly's argument implicates both displacement and preemption: whether federal law preempts Crum Plaintiffs' state-law claims and whether the OPA displaces federal maritime law. Dkt. No. 75 at 3–7 (arguing that maritime law governs Crum Plaintiffs' claims and the OPA preempts these maritime claims).

### A. The Vessel Defendants

The Vessel Defendants argue that the OPA displaces the Crum Plaintiffs' federal maritime claims. Dkt. No. 74 at 11–16. The amended complaint asserts negligence under both federal maritime law and Georgia state law, but it does not specify whether it

asserts claims for negligence per se, public nuisance, or trespass under federal maritime or Georgia state law. Dkt. No. 56 ¶¶ 136–79. These claims appear to be asserted under Georgia state law, so, inferring in Crum Plaintiffs' favor, the Court will treat them as such. Dkt. No. 79 at 6–9 (mentioning claims for negligence per se, public nuisance, and trespass in the context of discussing their state law claims). Thus, the Court evaluates whether Crum Plaintiffs' federal maritime negligence claim is displaced. Because the OPA's "detailed scheme . . . [displaces] the general oil-removal remedies that might've been available under . . . the common law," Savage Services Corp. v. United States, 25 F.4th 925, 939 (11th Cir. 2022), the claim is displaced.

In Savage, the Eleventh Circuit examined whether the OPA was exclusive and—by extension—whether the plaintiffs could pursue removal costs and damages by bringing common-law admiralty claims under the Suits in Admiralty Act ("SAA"). 25 F.4th at 938. The court held the OPA was exclusive. Id. at 939. The court explained, "where Congress enacts a specific remedy when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive." Id. (alterations accepted) (quoting Hink v. United States, 550 U.S. 501, 506 (2007)). The court continued,

> And that's pretty much what happened here. In 1990,
> Congress enacted a detailed—and precisely drawn—statute
> that governed almost every aspect of an oil-spill
> cleanup. . . . Congress didn't draw up this carefully
> balanced design—a veritable super-structure of oil-

cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home. *This detailed scheme thus preempts the general oil-removal remedies that might've been available under either the common law or the SAA.*

Id. (emphasis added).

Crum Plaintiffs respond that "the holding in Savage Services is limited to sovereign immunity's interplay in oil spill liability, and not whether the OPA preempts all maritime claims," citing the OPA's savings provision as support. Dkt. No. 78 at 19-20. Crum Plaintiffs are correct that *one of* the issues in Savage was "whether the OPA provided a waiver of sovereign immunity so that a claimant could pursue removal costs against the United States." 25 F.4th at 933-36. The court held that it did not. Id.

But the court did not end its analysis there. Next, the court examined whether the OPA was exclusive, such that, "even if the OPA may not *itself* contain a waiver of sovereign immunity, vessel owners may still go after the United States for removal costs and damages by bringing common-law admiralty claims against the Government pursuant to the SAA's sovereign-immunity waiver." Id. at 938. The court held that the OPA was exclusive, so the vessel owners could not pursue common-law admiralty claims against the Government. Id. at 938-44. This holding is directly applicable to this case, where Crum Plaintiffs—like the Savage claimants—seek to bring a common-law maritime claim for removal costs and damages

against the Vessel Defendants. As the <u>Savage</u> court held, the OPA's "detailed scheme . . . preempts the general oil-removal remedies that might've been available under . . . the common law." <u>Id.</u> at 939. Because the <u>Savage</u> court held that "a federal statute governs a question previously governed by federal common law," it was using the word "preemption" interchangeably with the word "displacement." <u>Am. Com. Lines, LLC</u>, 759 F.3d at 422. Thus, the <u>Savage</u> court held that the OPA displaces federal common-law oil removal remedies. Crum Plaintiffs federal maritime claims are therefore displaced by the OPA. <u>Savage</u>, 25 F.4th at 939; <u>see also</u> <u>S. Port Marine, LLC v. Gulf Oil Ltd. P'ship</u>, 234 F.3d 58, 65 (1st Cir. 2000) ("[W]e note that, although the parties have referred to this issue as one of 'preemption,' it does not present any of the federalism concerns normally associated with that word, because we are concerned only with the OPA's effect on preexisting *federal* law. The question, therefore, is not complicated by any 'presumption against preemption,' but is rather a straightforward inquiry into whether Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution. We conclude that Congress did so intend." (citations omitted)).

Crum Plaintiffs respond that some of the damages they assert were caused by non-oil debris, such as vehicles and vehicle parts.

40

Dkt. No. 78 at 21-23. Plaintiffs argue that "[t]he damages sustained by Plaintiffs from the vessel's discharge of substances not within the OPA's definition of 'oil' are not contemplated, discussed, or provided for in the OPA, and therefore not preempted." Id.

Crum Plaintiffs correctly note that debris such as cars and car parts do not fit within the OPA's definition of oil, which it defines as

> oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) and which is subject to the provisions of that Act [42 U.S.C. § 9601 et seq.].

33 U.S.C. § 2701(23).

However, despite its name, the OPA provides for recovery of more than just oil removal and damages directly caused by oil discharge. The text shows this in three ways. 33 U.S.C. Section 2702(a) states: "each responsible party for a vessel . . . from which oil is discharged, or which poses the substantial threat of a discharge of oil, . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident." Id.

First, the OPA provides for removal costs and damages that "result from such incident," not removal costs and damages caused

by the oil discharge. Id. Thus, rather than limiting recovery solely to the "discharge of oil," the OPA uses broader language, expanding recovery to "costs and damages . . . that result from such an incident." 33 U.S.C. § 2702(a); In re Settoon Towing, LLC, 859 F.3d 340, 351 (5th Cir. 2017) ("[C]ourts cannot, without any textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA." (quoting Am. Com. Lines, 759 F.3d at 426)). "Such incident" refers to a situation where a vessel discharges oil or there is a substantial threat that a vessel will discharge oil. 33 U.S.C. § 2702(a). As a result, the text covers more than simply recovery for damages directly attributed to oil, such as other damages caused by the incident which led to the discharge of oil or the substantial threat of oil discharge. And this makes sense considering that Congress intended the OPA to be a "detailed—and precisely drawn—statute [to] govern[] almost every aspect of an oil-spill cleanup," providing strict liability rather than dealing with the "fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies." Savage, 25 F.4th at 930, 939 (quoting S. Rep. No. 101-94 at 3).

Second, under the plain language of the statute, the OPA adheres (1) when a vessel discharges oil, like the Golden Ray did in this case, or (2) when there is a "substantial threat of discharge of oil." Id. Thus, the OPA may adhere *even when there is no oil discharge* but only a substantial threat of oil discharge.

Under Crum Plaintiffs' logic, even though the OPA would adhere when there is a "substantial threat of discharge of oil," a claimant could not recover under the OPA because there would be no actual discharge of oil. In other words, it would render that part of Section 2702(a) superfluous. See Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008) ("Another pertinent canon is the presumption against surplusage: we strive to give effect to every word and provision in a statute when possible." (citing Lowery v. Ala. Power Co., 483 F.3d 1184, 1204 (11th Cir. 2007))).

Third, when the OPA adheres, it provides strict liability for all "removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C. § 2702(a). The "removal costs and damages specified in subsection (b)," id., are not limited to oil remediation and removal, id. § 2702(b).

The OPA covers "all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title, under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law" and "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." Id. § 2702(b)(1); see also Matter of Complaint of Supreme Towing Co., Inc., No. CV 07-9231, 2010 WL 11561150, at *14 (E.D. La. Aug. 12, 2010) ("'The OPA imposes strict liability for

pollution removal costs and damages' on 'responsible parties' *when there is a discharge of oil in navigable water*. Numerous courts have held that the OPA, where applicable, preempts the Limitation Act and general maritime law." (emphasis added) (citations omitted)). 33 U.S.C. Sections 1321(c), (d), (e), and (l) involve the "removal of a discharge and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance," the preparation of a National Contingency Plan for removal of oil and hazardous substances, civil enforcement, and administration of the statutory section. "Hazardous substance" is defined as "any substance designated pursuant to subsection (b)(2) of this section." 33 U.S.C. § 1321(a)(14). Section (b)(2)(A) provides that "[t]he Administrator shall develop, promulgate, and revise as may be appropriate*, regulations designating as hazardous substances, other than oil as defined in this section*, such elements and compounds which, when discharged in any quantity into or upon the navigable waters of the United States . . . present an imminent and substantial danger to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches." 33 U.S.C. § 1321(b)(2) (emphasis added). Thus, discharge of a "hazardous substance," a recoverable cost under Section 2702(b)(1), includes substances "other than oil." 33 U.S.C. § 1321(b)(2)(A).

The National Contingency Plan, similarly, permits removal of materials besides oil. 40 C.F.R. Section 300.415(b) states: "At any release, regardless of whether the site is included on the National Priorities List (NPL), where the lead agency makes the determination . . . that there is a threat to public health or welfare of the United States or the environment, the lead agency may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release."

Moreover, only one of the six delineated categories of OPA damages mentions damages "caused by a discharge of oil." Id. § 2702(b)(F) (defining public services damages as "[d]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, *caused by a discharge of oil*, which shall be recoverable by a State, or a political subdivision of a State" (emphasis added)). The other five categories make no mention of oil discharge, so they permit damages "result[ing] from [an] incident" where there was oil discharge or a threat of oil discharge, even if the damages themselves were not caused by the discharge of oil. 33 U.S.C. § 2702(a); id. §§ 2702(b)(A)-(E) (defining natural resource damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining

45

real or personal property damages as "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage"; defining subsistence use damages as "[d]amages for loss of subsistence use of natural resources"; defining revenues damages as "[d]amages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources"; defining profits and earning capacity as "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.").

Limiting recoverable damages to only those directly caused by oil discharge would also raise a plethora of issues. For example, it would raise claim- and litigation- costs for both the claimants and the responsible parties as further expert analysis would be required to determine whether certain damages were caused by oil discharge or some other discharge from the damaged vessel. Moreover, several discharges could have concurrent effects. For example, where natural resources such as local marine life are harmed by a wreck, it could be extremely difficult, if not nearly impossible, to precisely attribute how much the oil discharge damaged the local marine life versus how much discharge of car parts and other hazardous substances damaged the marine life. While

46

this apportionment issue could possibly be resolved, it would undoubtedly complicate, elongate, and raise the expenses of OPA proceedings in a way that is not reflected by the text of the statute and does not serve to "promote settlement and avoid litigation." Nguyen, 805 F.3d at 138 (quoting Johnson, 830 F. Supp. at 310).

Thus, applying 33 U.S.C. Section 2702(a) to this case, the OPA covers damages from the non-oil debris Crum Plaintiffs seek to recover. See Dkt. No. 86 at 10–11. The non-oil debris Crum Plaintiffs mention in their amended complaint were discharged as a part of the Golden Ray wreck removal and threat mitigation efforts. In the amended complaint's factual allegations, Crum Plaintiffs state: "in [an] *attempt to stabilize the wreckage*, Defendants caused over 6,000 tons of rocks to be dropped in the Sound and around the Golden Ray," dkt. no. 56 ¶ 101 (emphasis added); "[b]y December 12, 2019, approximately 320,000 gallons of fuel, mixed with water, were pumped out, and approximately 44,000 gallons of petroleum products, hazardous substances, and 4,200 cars *remained submerged* in local waters," id. ¶ 102 (emphasis added); "T&T's Wreck Removal Plan included the placement of an [EPB] that was intended to *contain pollutants from the vessel and mitigate the effects of potential discharges*," id. ¶ 107 (emphasis added); "T&T's Wreck Removal Plan alleged that the limited number of large cuts would reduce *the potential* of inaccessible and un-

pumpable hydrocarbons and other pollutants from impacting the waters surrounding the wreck removal site," id. ¶ 108 (emphasis added); "the EPB would provide a protective barrier along the seabed, throughout the water column, and at the surface level *allowing for the retention and recovery of debris and other pollutants*," id. (emphasis added); "[r]epeated fires causing additional discharges of debris and hazardous fluids occurred *throughout the duration of the wreck removal*," id. ¶ 113 (emphasis added); and "[t]he *salvage operations also caused numerous cars, car parts, and other debris* to fall into the Sound where many remain, while others were carried off in the currents," id. ¶ 116 (emphasis added). See also Dkt. No. 56 at 17 ("The [s]alvage [o]peration [c]aused [m]ultiple [f]ires and [o]n-[g]oing [o]il [s]pills, and [d]umped [c]ars, [c]ar [p]arts, and [d]ebris into the [s]ound."). Thus, Crum Plaintiffs allege damages that "result from such incident"—an incident involving both "a vessel . . . from which oil [was] discharged" and which "pose[d] a substantial threat of discharge of oil." 33 U.S.C. § 2702(a). This is consistent with the Coast Guards' OPA-designated response to the wreck, which included recovery and remediation of non-oil debris. See Dkt. No. 25-5 at 2–29 (explaining that "pursuant to the requirements of OPA 90, and with the approval of the [Coast Guard], the Respondents have caused [Gallagher Marine Systems, LLC] to conduct daily operations, as described above, to address reports

of releases of petroleum products and/or *chemicals and debris from the Golden Ray*" and discussing debris monitoring and remediation (emphasis added)); see also Speaker v. U.S. Dep't of Health & Human Serv. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) (holding that documents outside the pleadings may be considered on a motion to dismiss if the documents are (1) central to the plaintiff's claim and (2) their authenticity is undisputed). As a result, the damages from non-oil pollution and debris Crum Plaintiffs claim are covered by the OPA, and the responsible parties are strictly liable for the removal costs and damages.

The OPA savings clause does not change this analysis. "It reads: 'Except as otherwise provided in this Act, this Act does not affect admiralty and maritime law.'" Id. (alteration accepted) (quoting 33 U.S.C. § 2751(e)). While Crum Plaintiffs are correct that the OPA does not displace "all maritime claims," dkt. no. 78 at 20, 22, the savings clause does not mean that all federal common-law claims—in particular, those related to damages from oil discharge or substantial threats of discharge—survive. The court explained this in Savage in the context of claims against the United States:

> the fact is that the OPA *has* "provided otherwise." The OPA is a detailed and comprehensive framework for apportioning oil-spill liability. Through its many parts, Congress chose *not* to afford vessel owners any cause of action against the United States. Quite the

contrary: It eliminated, as we've said, a provision—
present in the OPA's predecessor statute—that would've
allowed vessel owners to skirt liability in the case of
governmental negligence. And it strayed from similar
statutory schemes (like CERCLA and RCRA) that expressly
allow for contribution claims against the federal
government. The plain import of these unambiguous
decisions, then, is that Congress *has* provided
otherwise—by making clear that the Government is *not*
liable for oil-removal costs.

Id.; see also Am. Com. Lines, 759 F.3d at 426 ("As OPA did

'otherwise provide[ ],' ACL's claims against ES & H and USES for

return of payments made by the Fund under OPA cannot be saved by

this clause. To interpret § 2751(e) as ACL proposes would be to

supersede OPA, and courts cannot, without any textual warrant,

expand the operation of savings clauses to modify the scope of

displacement under OPA." (citation omitted)); In re Settoon

Towing, 859 F.3d at 351 ("The . . . language [in the OPA savings

clause] shows that the admiralty claims that are preserved are

those that are not addressed in the OPA. . . . The contribution

that is being sought in this case is addressed in the OPA.

Marquette's view of the interplay between Section 2709 and Section

2751 would transform the 'savings clause' into a supremacy clause

by advancing general maritime law over the express provisions of

the OPA."); Gabarick v. Laurin Mar. (Am.) Inc., 623 F. Supp. 2d

741, 746 (E.D. La. 2009) (hereinafter Gabarick II) ("Claimants

refer to the savings provision as a basis for their argument that

OPA is a supplemental rather than exclusive avenue for the damages

it covers. However, Claimants' memoranda ignores the first part of section (e)—'except as otherwise provided in this Act.' . . . The Act also uses the absolute words 'all' and 'shall,' stating that '*all* claims for . . . damages *shall* be presented first to the responsible party,' and allows for suit after exhaustion of the claims process as outlined in § 2713(c). 33 U.S.C. § 2713 (emphasis added). Hence, the plain language of the statute indicates its mandatory and exclusive nature with respect to its covered damages.").

The OPA has similarly "provided otherwise" as to claims involving non-oil debris discharged by a vessel that discharged oil or which posed a substantial threat of oil discharge. 33 U.S.C. § 2702(a). The OPA provides claimants a pathway to hold responsible parties strictly liable for removal costs and damages "that result from such incident." 33 U.S.C. § 2702(a). Thus, because the OPA "*has* 'provided otherwise'" as to the damages Crum Plaintiffs seek to recover under their federal maritime claims, the OPA displaces these claims.

Discussing the OPA, the Eleventh Circuit has commented, "Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home." Savage, 25 F.4th

at 939. Plaintiffs benefit greatly from this regime—they can hold defendants strictly liable for damages—but they may not seek to recover twice for the same damages under both the OPA and federal common law. Thus, Crum Plaintiffs' claim for federal maritime negligence is displaced by the OPA and the Court **GRANTS** the Vessel Defendants' motion to dismiss as to this claim.[6]

### B. Norton Lilly

Norton Lilly argues all Crum Plaintiffs' claims must be dismissed because (1) OPA displaces Crum Plaintiffs' federal maritime claims and (2) federal maritime law preempts Crum Plaintiffs' state-law claims. Dkt. No. 75 at 3–7. While Norton Lilly is correct as to the former argument, it is incorrect as to the latter.

### i. Displacement

Crum Plaintiffs assert claims for (1) negligence under federal maritime law and state law,[7] (2) negligence per se, (3)

---

[6] To the extent Crum Plaintiffs intended to assert their claims for negligence per se, public nuisance, and trespass under federal maritime law, these claims would be displaced by the OPA for the same reasons.

[7] Crum Plaintiffs state in their brief that they "specifically asserted a negligence claim under maritime law and concluded by reserving state law claim 'where necessary' to supplement maritime law. Plaintiffs did not set forth a standalone state law negligence claim." Dkt. No. 79 at 6 (citing Dkt. No. 56 ¶ 115). According to Crum Plaintiffs, they "included the reference to supplemental state law in the Complaint out of an abundance of caution in the event maritime jurisdiction does not attach to this negligence." Id. at 6–7. As discussed, infra pp. 56–61, maritime jurisdiction does attach to this negligence. Nevertheless, because Plaintiffs

public nuisance, and (4) trespass against Norton Lilly. Dkt. No. 56 ¶¶ 136–79; see also Dkt. No. 79 at 6–9 (mentioning their claims for negligence per se, public nuisance, and trespass in the context of discussing their state law claims). Unlike the Vessel Defendants, Norton Lilly seeks dismissal of all Crum Plaintiffs' claims. See generally Dkt. No. 75. As to Crum Plaintiffs' claim for negligence under federal maritime law, this claim is displaced by the OPA for the same reasons as discussed supra, pp. 34–49.[8]

Crum Plaintiffs, however, argue that "OPA liability extends only to the party designated as 'the responsible party.'" Dkt. No. 79 at 9–10 (citing 33 U.S.C. § 2702). Because Norton Lilly was not designated a "responsible party," Crum Plaintiffs assert, they may bring federal and state maritime claims against Norton Lilly that the OPA would otherwise displace or preempt against a responsible party. Id. This argument fails.

As discussed, the OPA savings clause "reads: 'Except as otherwise provided in this Act, this Act does not affect admiralty and maritime law.'" Savage, 25 F.4th at 941 (alteration accepted) (quoting 33 U.S.C. § 2751(e)). And the OPA "has 'provided

---

assert both causes of action in the amended complaint, the Court analyzes both maritime and state-law negligence as the causes of action applicable in this case.

[8] Again, to the extent Crum Plaintiffs intended to assert their claims for negligence per se, public nuisance, and trespass under federal maritime law, these claims would be displaced by the OPA for the same reasons.

otherwise'" as to non-responsible parties for claims seeking to recover costs or damages resulting from a vessel discharging oil or posing a substantial threat of oil discharge. Savage, 25 F.4th at 941. "Through its many parts, Congress chose *not* to afford" claimants a cause of action against non-responsible parties. Id. Instead, it compensates claimants through strict liability against the responsible parties. 33 U.S.C. § 2702(a) The responsible parties, in turn, may seek recovery from non-responsible parties. See 33 U.S.C. §§ 2702(d)(1)(B), 2709. Because the OPA "has 'provided otherwise'" as to claims for costs and damages against non-responsible parties, the OPA displaces and preempts such claims as to non-responsible parties. Savage, 25 F.4th at 941. Therefore, Norton Lilly's motion to dismiss, dkt. no. 75, is **GRANTED** as to Crum Plaintiffs' federal maritime law.

### ii. Preemption

Norton Lilly argues that maritime law, not state law, governs Crum Plaintiffs' claims. Dkt. No. 75 at 3-5. It is true that maritime law *could* govern Plaintiffs' claims against Norton Lilly. Dkt. No. 75 at 3-5. "To determine whether a claim falls under federal admiralty jurisdiction, the United States Supreme Court enunciated two tests, which address the location where the injury occurred and the incident's connection to maritime activity." Anderson v. United States, 317 F.3d 1235, 1237 (11th Cir. 2003) (citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,

513 U.S. 527, 534 (1995)); see also Dkt. No. 75 at 3–5 (arguing Crum Plaintiffs' claims are governed by federal maritime jurisdiction). These tests are known as the "location" and "connection" test, respectively. Id.

> Under the location test, a court must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. Under the connection test, a court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

Id. (alterations accepted) (quoting Jerome B. Grubart, Inc., 513 U.S. at 534).[9]

---

[9] Crum Plaintiffs argue that state law governs where "there is no federal maritime law" governing the cause of action. Dkt. No. 79 at 7–8. This misunderstands admiralty law. The "location" and "connection" test determine whether federal admiralty jurisdiction applies. Anderson, 317 F.3d at 1237 (quoting Jerome B. Grubart, 513 U.S. at 534). "[O]nce it is determined that the case involves a maritime tort, the case is governed by the substantive admiralty law. Courts have uniformly so held." Mink v. Genmar Indus., Inc., 29 F.3d 1543, 1548 (11th Cir. 1994) (first citing E. River S.S. Corp. v. Transam. Delaval, Inc., 476 U.S. 858, 862–66 (1986); and then citing Exec. Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 254 (1972)). "Indeed, the federal interest in uniformity is such that the courts have developed a reverse-Erie doctrine, by virtue of which the same federal maritime law applies in maritime cases, whether the case is brought in state court or in federal court based on diversity of jurisdiction." Id. As with other federal common law, "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state

The "location" and "connection" tests are satisfied as to all
Crum Plaintiffs' state-law causes of action. First, the "location"
test is satisfied because "the tort[s] occurred on navigable
water." Anderson, 317 F.3d at 1237 (quoting Jerome B. Grubart, 513
U.S. at 534). "Under the locality test, the tort occurs 'where the
alleged negligence took effect,' rather than where the negligent
act was done." Harville v. Johns-Manville Prod. Corp., 731 F.2d
775, 782 (11th Cir. 1984) (citations omitted); see also Lanzi v.
Yamaha Motor Corp., No. 8:17-CV-2020-T-36AEP, 2019 WL 10984163, at
*3 (M.D. Fla. Oct. 8, 2019) (same); Chartis Prop. Cas. Co. v.
Frenchman's Marina Resort, Ltd., No. 13-CV-80933, 2015 WL
12723104, at *4 (S.D. Fla. Jan. 16, 2015) ("Even though the acts
giving rise to a tort may have occurred on land, under the locality
test, in order to determine where the tort occurred, the court
must still consider 'where the alleged negligence took effect,'
rather than where the negligent act was done." (first quoting Exec.
Jet, 409 U.S. at 266; and then citing In re Dearborn Marine Serv.,
Inc., 499 F.2d 263, 274 (5th Cir. 1974)); Sea Vessel, Inc. v.
Reyes, 23 F.3d 345, 348 (11th Cir. 1994) ("[W]e must consider the

---

law does not frustrate national interests in having uniformity in
admiralty law." Coastal Fuels Mktg., Inc. v. Fla. Exp. Shipping
Co., 207 F.3d 1247, 1251 (11th Cir. 2000) (collecting cases). This,
however, does not mean that the claim is governed by state law
instead of admiralty law. Rather, *in applying admiralty law*, the
court may borrow state law principles. See Dkt. No. 89 at 3-4.

situs of the fire (locality test) as well as the relationship between a fire on a vessel in dry dock undergoing routine repairs and traditional maritime activity (situs test) in order to determine whether this case is cognizable in admiralty."); Wilkins v. Com. Inv. Tr. Corp., 153 F.3d 1273, 1278 (11th Cir. 1998) ("Torts fall within maritime jurisdiction only if they occur or have effects on navigable water." (citing Jerome B. Grubart, 513 U.S. at 534)). "Hence, a tort 'occurs' at a maritime situs when a gun is fired from land into a boat on navigable waters, and when components of a ship's navigational system are negligently manufactured on land but cause a collision on the high seas." Harville, 731 F.2d at 782.

As for Crum Plaintiffs' negligence claim, "the alleged negligence took effect" on navigable water because the Golden Ray capsized in the St. Simons Sound. Harville, 731 F.2d at 782; Dkt. No. 56 ¶ 143 ("As a result of Defendants' negligence, the vessel became unstable and listed dramatically, forcing the State Pilot in a split-second decision to run the Golden Ray into a sandbar to avoid a collision with an inbound vessel . . . and prevent shipwreck in deeper waters."). Even actions on land contributed to the capsize, such as when Norton Lilly's preload plan contained inaccurate data, the chief officer inaccurately input information into the LOADCOM computer, or the master of the Golden Ray did not review or verify the calculations, dkt. no. 56 ¶¶ 67-72, and "the

tort occurred on navigable water" because "the alleged negligence took effect" on navigable water—the Golden Ray capsized there, id. ¶¶ 1, 83; cf. Sisson v. Ruby, 497 U.S. 358, 361 (1990) ("[W]e refused to enter into a debate over whether the tort occurred where the plane had crashed and been destroyed (the navigable waters of Lake Erie) or where it had struck the sea gulls (over land)." (citing Executive Jet, 409 U.S. at 266–67)); Harville, 731 F.2d at 782 ("Although the negligent acts and omissions that the plaintiffs in this case allege occurred on land, for purposes of the jurisdictional test the tort occurred where the plaintiffs were exposed to the asbestos that caused their injuries."); Ayers v. United States, 277 F.3d 821, 827 (6th Cir. 2002) ("To engage in . . . a debate [about whether the tort occurred on land because the lockmaster activated the mechanism to release the water on land] . . . would be to apply too mechanical an application of the locality test, something that the Supreme Court has recognized as neither 'sensible' nor 'consonant with the purposes of maritime law." (quoting Jerome B. Grubart, 513 U.S. at 533)). As a result, as Crum Plaintiffs admit, the state-law negligence claim satisfies the "location" test. Dkt. No. 79 at 6.

The same logic applies to Crum Plaintiffs' claims for public nuisance and trespass. The "alleged negligence took effect" on navigable waters because Defendants allegedly "obstruct[ed] navigable waters" by causing the vessel to capsize and mishandling

the wreck removal. Dkt. No. 79 at 7–8 ("To be clear, Plaintiffs allege that Defendants created multiple public nuisances by obstructing navigable waters. . . . Similarly, Norton Lilly trespasses on Plaintiffs' property each and every time oil, car parts, and debris make contact with Plaintiffs' vessels and equipment and interfere with their use."). Thus, Crum Plaintiffs' tort claims for public nuisance and trespass "occur[ed] or [had] effects on navigable water." Wilkins, 153 F.3d at 1278 (citing Jerome B. Grubart, 513 U.S. at 534).

Second, the "connection" test is satisfied because the "activity giving rise to the incident" underlying all Crum Plaintiffs' state-law claims was maritime shipping and thus maritime commerce, which has "a substantial relationship to traditional maritime activity." Id.; see also Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982) ("[T]he primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce.").

According to Norton Lilly, because Plaintiffs' claims satisfy the test for maritime jurisdiction, Plaintiffs plead maritime—not state law—claims, which are displaced by the OPA. Dkt. No. 75 at 3–5. However, Norton Lilly's conclusion rests on a false premise. Norton Lilly's argument presumes that maritime law, if it can apply, *must be exclusive*. Id. at 3–5 ("Each of [P]laintiffs' claims is therefore governed by maritime law."). This is not how maritime

law functions. Instead, maritime law and state law can act
concurrently. See, e.g., Kossick v. United Fruit Co., 365 U.S.
731, 739 (1961) ("[T]he fact that maritime law is—in a special
sense at least—federal law and therefore supreme by virtue of
Article VI of the Constitution carries with it the implication
that wherever a maritime interest is involved, no matter how slight
or marginal, it must displace a local interest, no matter how
pressing and significant. *But the process is surely rather one of
accommodation*, entirely familiar in many areas of overlapping
state and federal concern, or a process somewhat analogous to the
normal conflict of laws situation where two sovereignties assert
divergent interests in a transaction as to which both have some
concern." (emphasis added) (citation omitted)); Ballard Shipping
Co. v. Beach Shellfish, 32 F.3d 623, 631 (1st Cir. 1994) ("We hold,
then, that the Rhode Island's Compensation Act as reasonably
construed and applied is not preempted by the admiralty clause of
the Constitution."); Kodiak Island Borough v. Exxon Corp., 991
P.2d 757, 769 (Alaska 1999) ("Because the *Robins* rule is not a
'characteristic feature' of admiralty and the application of
Alaska law will not unduly interfere with the harmony and
uniformity of the admiralty system, we hold that federal law does
not preempt enforcement of the damages provisions of Alaska's
hazardous substances statutes."). Here, Crum Plaintiffs' claims
are properly pled under Georgia state law because the Golden Ray

wreck occurred within Georgia's territorial waters. Dkt. No. 56
¶¶ 1, 83 ("[T]he [Golden Ray] . . . capsized in the St. Simons
Sound, off the coast of Georgia."); Dowis v. Mud Slingers, Inc.,
621 S.E.2d 413, 415-16, 419 (Ga. 2005) (explaining that Georgia's
choice of law for torts is "lex loci delicti," which means "where
the tort was committed"). Thus, the question becomes whether this
is one of the cases where a plaintiff in an oil-spill case may
assert both state and federal law claims, even though the state
claims seem duplicative.

Courts and commentators have recognized that federal maritime
preemption doctrine is difficult. See, e.g., Thomas J. Schoenbaum,
Admiralty and Maritime Law, § 4:4 (6th ed.) ("The issue of
federalism in admiralty and the scope of application of state law
in maritime cases is one of the most perplexing issues in the
law."); Steven R. Swanson, Federalism, the Admiralty, and Oil
Spills, 27 J. Mar. L. & Com. 379, 379-80 (1996) ("The federalism
issues created by civil damages suits brought by private litigants
have received less attention than they deserve. The *Exxon Valdez*
disaster showed that a major oil spill can implicate both federal
and state laws. Plaintiffs claiming harm from the spill brought
actions under state and federal law in both legal systems. The
resulting liability questions centered on the interaction of
federal general maritime law, federal statutory law, state common
law, and state statutory law. This collection of remedies caused

a great deal of confusion and controversy. After years of
Congressional inaction, the magnitude of the problems presented in
the *Exxon Valdez* case led to the passage of the [OPA] which
continued to allow the application of state law *without fully
clarifying how federal and state law were to interact*." (emphasis
added) (footnote omitted)); William R. Gignilliat, The Gulf Oil
Spill: OPA, State Law, and Maritime Preemption, 13 Vt. J. Envtl.
L. 385, 388 (2011) ("The doctrine [governing maritime preemption]
has not been applied clearly in the past."). As one court noted,
"[d]iscerning the law in this area is far from easy; one might
tack a sailboat into a fog bank with more confidence." Beach
Shellfish, 32 F.3d at 624. Instead, courts apply the Jensen[10] test
to determine whether maritime law preempts state law. See, e.g.,
Gignilliat, supra, at 409-15 (discussing how the Jensen test could
apply during an oil spill); MBH Mar. Int. LLC v. Manteiga, No. 17-
61909-CIV, 2018 WL 1363844, at *5 (S.D. Fla. Mar. 15, 2018)
(explaining and applying the Jensen test).

Caselaw analyzing when plaintiffs' state-law claims are
preempted in OPA cases have yielded different results and
rationales. See Gignilliat, supra, at 404-05; Sekco Energy, 820 F.
Supp. at 1013 (holding that federal maritime law preempted state
law because federal maritime law "applie[d] 'of its own force'"

---

[10] S. Pac. Co. v. Jensen, 244 U.S. 205 (1917).

(quoting Union Tex. Petroleum v. PLT Eng'g, 895 F.2d 1043, 1047
(5th Cir. 1990))); Williams v. Potomac Elec. Power Co., 115 F.
Supp. 2d 561, 565 (D. Md. 2000) (relying upon United States v.
Locke, 529 U.S. 89 (2000), to find that "OPA does not preempt
'state laws of a scope similar to the matters contained in Title
I of OPA,' such as the state common law actions pleaded here");
Dostie Dev., Inc. v. Arctic Peace Shipping, Co. Inc., No. 95-808-
CIV-J-MMP, 1996 WL 866119, at *3 (M.D. Fla. Aug. 14, 1996) (relying
upon 33 U.S.C. Section 2718(a)(2) to find that the OPA did not
preempt the plaintiffs' common law negligence claim); Nat'l
Shipping Co. of Saudi Arabia v. Moran Trade Corp. of Del., 122
F.3d 1062 (4th Cir. 1997) (holding that the OPA preempted state
law claims by a plaintiff who was initially designated the
responsible party to recover expenses against the third party that
was the sole cause of the spill); Isla Corp. v. Sundown Energy,
LP, No. CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27,
2007) (finding no preemption by relying on a removal case, Tanguis
v. Westchester, 153 F. Supp. 2d 859, 863 (E.D. La. 2001), where
the court noted that a group of commentators observed "that the
OPA 'does not preempt state law in the area of oil spill liability
and compensation'"); Mid-Valley Pipeline Co. v. S.J. Louis Const.,
Inc., 847 F. Supp. 2d 982, 990 (E.D. Ky. 2012) (applying conflict
preemption analysis and holding that the OPA preempted the
plaintiff's state-law claim for indemnification because it

conflicted with the OPA but that the OPA did not preempt the plaintiff's contribution claim because it did not conflict); see also In re Deepwater Horizon, 745 F.3d 157, 171 (5th Cir. 2014) (analyzing preemption of state-law claims under the OPA and CWA and holding that "[f]ederal law, the law of the point source, exclusively applies to the claims generated by the oil spill in any affected state or locality, [but] [p]reemption is limited to situations in which the affected state is not the point source jurisdiction; affected states may still pursue relief based on the OPA and the CWA or the law of the point-source"); In re Oil Spill by Oil Rig DEEPWATER HORIZON the Gulf of Mexico, on Apr. 20, 2010, No. 10-3059, 2011 WL 5520295, at *8 (E.D. La. Nov. 14, 2011) (state law claims related to an oil spill that occurred outside of state territorial waters were preempted under the OPA and CWA).

At first glance, the resolution of the issue in this case seems clear. See, e.g., Dkt. No. 79 at 11–12 ("The OPA, by its terms, preserves state law claims."); Cynthia M. Wilkinson et. al., Slick Work: An Analysis of the Oil Pollution Act of 1990, 12 J. Energy Nat. Resources & Envtl. L. 181, 221 (1992) ("[T]he OPA explicitly does not preempt state law in the area of oil spill liability and compensation."). 33 U.S.C. Section 2718(a) provides:

Nothing in this Act or the Act of March 3, 1851 shall—

(1) affect, or be construed or interpreted as preempting, the authority of any State or political

subdivision thereof from imposing any additional
liability or requirements with respect to—

    (A) the discharge of oil or other pollution by oil
    within such State; or

    (B) any removal activities in connection with such
    a discharge; or

(2) affect, or be construed or interpreted to affect or
modify in any way the obligations or liabilities of any
person under the Solid Waste Disposal Act (42 U.S.C.
6901 et seq.) or State law, including common law.

But Norton Lilly's argument—framing the issue as one of state law preemption by federal maritime common law rather than the OPA itself—raises pertinent questions. By not "affect[ing]" the authority of states or modifying liabilities, the OPA could have preserved the authority of the states as it was before its enactment—that is, courts should apply Jensen and other preemption analyses to determine whether a plaintiff's state-law claims are preempted by federal maritime law, which, in turn, the OPA displaces. Cf. Wilkinson et al., supra, at 222–23 ("While attempts were made during negotiations to include language that specified what areas were preempted and what areas were not, the Senate was leery of doing so."). Or, as in Mid-Valley Pipeline, 874 F. Supp. 2d at 990, the OPA may still impliedly preempt state law that provides conflicting remedies and liability for oil pollution. Or, 33 U.S.C. Section 2718(a) removes the Jensen test or other preemption tests from the analysis, permitting *any* state common law claims that also impose liability for oil spills. These

different interpretations explain the different analyses courts have conducted regarding this issue. Compare Williams, 115 F. Supp. 2d at 565 and Dostie Dev., 1996 WL 866119, at *3, with Sekco Energy, 820 F. Supp. at 1013 and Mid-Valley Pipeline, 847 F. Supp. 2d at 990.

Given the text of 33 U.S.C. Section 2718(a), persuasive authority, and indications of Congressional intent, the Court follows the latter analysis and finds that Section 2718(a) permits Crum Plaintiffs' state-law claims. As noted, the phrase "[n]othing in this Act . . . shall . . . affect," as used in Section 2718(a), is subject to multiple interpretations—that is, (1) to not change from what it was prior to the OPA's enactment, retaining the status quo, or (2) to remove any impediments. Given that Section 2718(a) expressly mentions "imposing . . . *additional liability*" and "obligations or liabilities under . . . State law, *including common law*" and the state common law causes of action in this case would impose additional liability, the second interpretation seems most likely. Moreover, that Congress chose to include not only the word "affect" but also "construed or interpreted as preempting" or "construed or interpreted to affect or modify in any way" indicates a strong intent to preserve duplicative or overlapping state law, including state common law, causes of action. See also Wilkinson et. al., supra, at 222-23 ("Section [2718] of the OPA makes clear that states may impose additional requirements regarding oil spill

66

liability, removal activities, penalties and fines, and oil spill trust funds.").

United States v. Locke supports this. 229 U.S. at 104–06. In Locke, the Supreme Court held that Washington's regulations governing the operation of oil tankers were preempted by federal law, reasoning that the OPA's savings clauses "may preserve a State's ability to enact laws of a scope similar to Title I, but do not extend to subjects addressed in the other titles of the Act or other acts." Id. The Court explained, "[i]n contrast to the Washington rules at issue . . . , Title I does not regulate vessel operation, design, or manning." Id. at 105. It concluded, "[t]he evident purpose of the savings clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." Id. "Our view of [the] OPA's savings clauses preserves this important role for States, which is unchallenged here." Id. at 106. Thus, while the Court's decision involved laws outside of Title I's scope, the Court strongly suggested that the OPA's savings clauses preserved state laws "of a similar scope to Title I," which imposes liability related to oil discharge or threats of oil discharge. Section 2718(a)(2) clarifies that "state law" includes "common law," such as the causes of action in this case. Other OPA cases that considered whether a plaintiff may bring state-law liability claims have also

adopted this view. See Williams, 115 F. Supp. 2d at 565; Dostie Dev., 1996 WL 866119, at *3; Isla Corp, 2007 WL 1240212, at *2; see also Gignilliat, supra, at 406; Wilkinson et al., supra, at 221.

Importantly, this does not prevent other federal statutes, such as the CWA, from preempting state-law claims imposing additional liability for oil discharge or threats of oil discharge. Cf. In re Deepwater Horizon, 745 F.3d at 172–73 ("[T]he OPA was designed to complement, not compete with the CWA. That the OPA was enacted more recently than the CWA means little where there is no fundamental conflict with provisions of the CWA. The statutes, in other words, must be construed, as the district court noted, in pari materia. . . . Thus, while Section 2718(c) saves from the OPA's diminution the ability of the United States or state entities to impose requirements relating to oil discharges, it does not save those powers from the effects of the CWA or any other non-identified federal law."). However, no CWA claim is before the Court, and neither party argues that the CWA or another federal statute impacts preemption in this case, so the Court will not address that issue. Thus, as the case currently stands before the Court, Crum Plaintiffs' state law claims are not preempted because 33 U.S.C. Section 2718(a) permits their state law claims.

### III. State law claims

Norton Lilly argues that, even if maritime law and the OPA do not preempt Crum Plaintiffs' state law claims, these claims fail on the merits. Dkt. No. 75 at 9–19. When evaluating a motion to dismiss, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016). "Legal conclusions without adequate factual support are entitled to no assumption of truth," and a motion to dismiss "is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" Id. (alterations accepted) (first citing Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011); and then quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Crum Plaintiffs' state law claims are properly pled.

### A. Negligence

According to Norton Lilly, Crum Plaintiffs' negligence claim fails because Norton Lilly (1) did not owe a duty to Plaintiffs and (2) did not proximately cause the Golden Ray to capsize. Dkt. No. 75 at 9–13.

Crum Plaintiffs sufficiently allege that Norton Lilly owed them a duty. A "legal duty is the obligation to conform to a standard of conduct under the law for the protection of others

69

against unreasonable risks of harm." Rasnick v. Krishna Hosp., Inc., 713 S.E.2d 835, 837 (Ga. 2011). Crum Plaintiffs allege that Norton Lilly had various responsibilities while acting as the Golden Ray's agent at the Port of Brunswick. Dkt. No. 56 ¶¶ 61-63, 66-70. This included "port services and logistics" for "loading and securing of [the vessel's] cargo," "proficiently securing the cargo for the voyage," "securing of cargo and vessel loading and discharge of cargo," and "develop[ing] a preliminary load plan." Id. Crum Plaintiffs also allege: "At all times material hereto, Defendants owed a duty to exercise reasonable care in the operation of the Golden Ray, including loading the vessel such that it would not capsize and wreck." Dkt. No. 56 ¶ 139. Thus, Crum Plaintiffs properly allege that Norton Lilly owed them a duty in performing their vessel responsibilities. That Plaintiffs allege that the other Defendants who owned, chartered, crewed, or operated the Golden Ray also owe a duty to them does not negate this. Whether there were contractual provisions governing allocation of the duty or whether Crum Plaintiffs were foreseeable victims given the other Defendants' duties to review the load plan and load and ballast the boat are questions that should be left for discovery.

Similarly, Crum Plaintiffs sufficiently allege proximate cause, and Norton Lilly's argument regarding proximate cause should be left for summary judgment. Norton Lilly argues that there cannot be proximate cause between its actions and the injury

because the other Defendants' negligence were independent, intervening acts or omissions "which w[ere] not foreseeable by [Norton Lilly,] w[ere] not triggered by [Norton Lilly's] act, and which w[ere] sufficient of itself to cause the injury." Dkt. No. 75 at 12–13 (quoting <u>Pruette v. Phoebe Putney Mem'l Hosp.</u>, 671 S.E.2d 844, 850 (Ga. Ct. App. 2008)). Crum Plaintiffs allege: "Due to the inaccurate data from Norton Lilly's preload plan and the chief officer's inaccurate manual IMACS inputs, the LOADCOM computer did not calculate the vessel's vertical center of gravity prior to the vessel's departure from the Port of Brunswick and thereby the Golden Ray failed to meet stability requirements for operation," dkt. no. 56 ¶ 72; "Defendants' acts and omissions . . . were caused by joint negligence," <u>id.</u> ¶ 142; and, "[a]s a result of Defendants' negligence, the vessel became unstable and listed dramatically," resulting in the Golden Ray's capsize, <u>id.</u> ¶ 143. Accepting Crum Plaintiffs' factual allegations as true, Norton Lilly's inaccurate data caused the Golden Ray's instability and subsequent capsize. Drawing inferences in favor of Plaintiffs, as the Court must do at this stage, Norton Lilly was jointly negligent with the chief officer, it was foreseeable that the other Defendants would also commit negligent acts, or the acts were not "independent," "intervening," or "sufficient" to cause the injury. <u>Pruette</u>, 671 S.E.2d at 850. Crum Plaintiffs have adequately pled proximate cause, and discovery will elucidate whether proximate

cause actually existed based on the specific evidence in the case. See Ontario Sewing Mach. Co. v. Smith, 572 S.E.2d 533, 536 (Ga. 2002) ("[I]t is axiomatic that questions regarding proximate cause are 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed cases.'" (quoting Atlanta Obstetrics & Gynecology Grp. v. Coleman, 398 S.E.2d 16 (Ga. 1990))).

Norton Lilly also argues that Crum Plaintiffs' allegation of "inaccurate data" is vague and conclusory because Crum Plaintiffs "do[] not identify any data that was allegedly inaccurate or articulate how it could have prevented the ship's computer from calculating the correct center of gravity." Dkt. No. 75 at 13. This is, in essence, a factual dispute. Crum Plaintiffs alleged: "Due to the inaccurate data from Norton Lilly's preload plan and the chief officer's inaccurate manual IMACS inputs, the LOADCOM computer did not calculate the vessel's vertical center of gravity prior to the vessel's departure from the Port of Brunswick and thereby the Golden Ray failed to meet stability requirements for operation." Dkt. No. 56 ¶ 72. This allegation is not conclusory—it explains that Norton Lilly's inaccurate data caused the Golden Ray's instability, which is entitled to the presumption of truth. In discovery, the parties can present evidence to determine whether the computer "did not calculate the vessel's vertical center of gravity" due to the preload plan. Id. On a motion to dismiss,

72

however, Plaintiffs' factual allegations are treated as true. Therefore, Crum Plaintiffs state a claim for state-law negligence. As a result, Norton Lilly's motion to dismiss, dkt. no. 75, is **DENIED** as to this cause of action.

### B. Negligence per se

Norton Lilly urges the Court to dismiss Crum Plaintiffs' negligence per se cause of action because Plaintiffs dismissed their underlying causes of action for violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"). Dkt. No. 75 at 13–14. Crum Plaintiffs admit that they "have dismissed the underlying [CWA] and [RCRA] claims." Dkt. No. 79 at 19. Crum Plaintiffs "ask the Court to reserve ruling on their negligence per se claim" until they "refile [the CWA and RCRA claims] after service of the appropriate notice letters is perfected and the waiting period elapses." Id. at 19–20. These arguments overlook the components of a negligence cause of action.

A negligence per se claim *is a negligence claim*, where violation of a statute is per se evidence that the defendant acted below the standard of care. See, e.g., Handberry v. Manning Forestry Servs., LLC, 836 S.E.2d 545, 548 (Ga. Ct. App. 2019). For a violation of a statute to be per se evidence of negligence, (1) the injured party must fall within the class of persons the statute was intended to protect, and (2) the harm complained of must be the harm against which the statute was intended to guard. See,

e.g., <u>Rockefeller v. Kaiser Found. Health Plan of Ga.</u>, 554 S.E.2d 623, 626 (Ga. Ct. App. 2001). Here, Crum Plaintiffs allege: "Defendants' past and ongoing discharge of oil and other pollutants, and dumping of cars, car parts, and related materials and debris from the Golden Ray and subsequent salvage operations into the Sound and surrounding environment violated and continue to violate several statutes, including sections 301 and 402 of the CWA as well as the RCRA" and "[t]he harm to Plaintiffs is the type of harm the statutes were designed to guard against, and Plaintiffs fall within the class of persons these statutes were intended to protect." Dkt. No. 56 ¶¶ 147–51. Plaintiffs also allege that Defendants breached their duties owed to Plaintiffs and that violation of the statutes were the direct and proximate cause of Plaintiffs' damages. <u>Id.</u> Thus, Crum Plaintiffs have adequately pled negligence per se, despite not alleging underlying CWA and RCRA claims. Again, negligence per se is a *type* of negligence claim where a plaintiff may prevail by showing an applicable statutory violation. Although Crum Plaintiffs plead negligence per se and a separate negligence claim, <u>id.</u> ¶¶ 136–51, both claims allege the tort of *negligence*. Because Crum Plaintiffs properly pled their cause of action, Norton Lilly's motion to dismiss, dkt. no. 75, is **DENIED** as to negligence per se.

## C. Public nuisance

Norton Lilly argues that Crum Plaintiffs' public nuisance cause of action fails because (1) "no private property owned by . . . [P]laintiffs have been damaged" and (2) Norton Lilly did not have control over the nuisance. Dkt. No. 75 at 14–19.

First, a claim for public nuisance, by its nature, does not require damage to a plaintiff's private property. "A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." O.C.G.A. § 41-1-2.  "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance." City of Coll. Park v. 2600 Camp Creek, LLC, 666 S.E.2d 607, 608 (Ga. Ct. App. 2008) (quoting OCGA § 41-1-1). "In addition, a public nuisance requires 'some act or omission which obstructs or causes inconvenience to the public in the exercise of rights common to all.'" Id. (quoting Cox v. De Jarnette, 123 S.E.2d 16 (Ga. Ct. App. 1961)).

Second, Crum Plaintiffs allege that Norton Lilly had control over the nuisance. As both parties recognize, "the essential element of nuisance is control over the *cause* of the harm." Fielder v. Rice Const. Co., 522 S.E.2d 13, 16 (Ga. Ct. App. 1999) (emphasis added); Dkt. No. 74 at 14; Dkt. No. 78 at 20–22. However, there may be multiple causes of a single harm; "[t]he tortfeasor must be

either the cause or *a concurrent cause of the creation,* continuance, or maintenance of the nuisance." <u>Fielder</u>, 522 S.E.2d at 16 (emphasis added); <u>Sanders v. Henry Cnty.</u>, 484 F. App'x 395, 399 (11th Cir. 2012). Crum Plaintiffs allege that Norton Lilly, tasked with creating the preload plan, executed a deficient plan that contributed to the Golden Ray capsize. Dkt. No. 59 ¶¶ 65–68, 72, 90, 92–94, 153–56. Drawing inferences in favor of Crum Plaintiffs, Norton Lilly was the cause or a concurrent cause of the creation of the nuisance. Whether Norton Lilly truly was the cause or a concurrent cause is an issue for discovery. At this stage in the case, however, Crum Plaintiffs state a claim for public nuisance.

Norton Lilly quotes <u>City of Macon v. Roy</u>, 130 S.E. 700, 702 (Ga. 1925), to show that "even if a defendant's negligence causes another to create a nuisance, it does not render the negligent defendant liable for nuisance." Dkt. No. 75 at 15. The quote reads:

> Negligence is not even a necessary ingredient of a cause of action growing out of a nuisance. A nuisance may arise through acts and conduct done within the pale of the law and executed with due care; and yet if the result attained injures the property or individual rights of another by causing a nuisance, the maintainer must either abate the nuisance or else respond in damages.

<u>Id.</u> (quoting <u>Roy</u>, 130 S.E. at 702); <u>see also</u> <u>McLendon & Cox v. Roberts</u>, 398 S.E.2d 579, 579 (Ga. Ct. App. 1990) ("[N]egligence is not always a necessary element of a cause of action for nuisance." (citing <u>City of Macon v. Cannon</u>, 79 S.E.2d 816 (Ga. 1954))).

This quote explains that negligence is not necessary to bring a nuisance claim, rather, a defendant may have acted legally and with the proper level of care and still cause a nuisance. While negligence is not required to bring a nuisance claim, this does not mean that negligence precludes a nuisance claim.

Norton Lilly further argues that Crum Plaintiffs' allegations give rise only to a negligence cause of action rather than one for nuisance. Dkt. No. 75 at 15. Georgia courts have recognized that "[t]here is general agreement that nuisance is incapable of any exact or comprehensive definition." Fielder, 522 S.E.2d at 16 (quoting Cox, 123 S.E.2d at 24). "In general . . . the owner of the property from which the nuisance emanates is the proper defendant in an action for damages flowing from the creation or maintenance of a nuisance." McLendon & Cox, 398 S.E.2d at 579. This makes sense because nuisance cases typically involve nuisance emanating from real property, where the owner of the property has substantial control over the creation and maintenance of the nuisance. This case is different because it involves nuisance emanating from a shipwreck and involves several parties exercising substantial control over the property that emanated the nuisance—the owner of a large shipping vessel, such as in this case, often delegates control over aspects of the vessel and shipping to several parties. Drawing inferences in favor of Plaintiffs, Norton Lilly exercised substantial control over the "loading and securing

of [the Golden Ray's] cargo." Dkt. No. 56 ¶¶ 62-68 (Norton Lilly was responsible for "port services and logistics" for "loading and securing of [the vessel's] cargo," "proficiently securing the cargo for the voyage," "securing of cargo and vessel loading and discharge of cargo," and "develop[ing] a preliminary load plan"). Improper loading of the cargo caused the vessel to be top-heavy and in danger of capsizing. Id. ¶ 90-94. Although "[t]he chief officer of the Golden Ray reviewed Norton Lilly's preload plan," drawing inferences in favor of Plaintiffs, Norton Lilly still retained substantial control over the plan considering it also created a "final load plan." Id. ¶¶ 68, 92-94; cf. Fielder, 522 S.E.2d at 17 (plaintiff permitted to bring claim against the health department, which approved the plan to use a septic tank, and the builder/developer). Discovery will clarify whether Norton Lilly in fact exercised enough control over the loading and securing of the vessel's cargo to support a public nuisance claim. Therefore, Norton Lilly's motion to dismiss, dkt. no. 75, is **DENIED** as to Crum Plaintiffs' public nuisance claim.

### D. Trespass

According to Norton Lilly, Crum Plaintiffs' trespass claim fails because "[P]laintiffs do not allege that Norton Lilly to[ok] any step with the knowledge that intermeddling with their chattel would result." Dkt. No. 75 at 16. In making this argument, Norton Lilly assumes that maritime law applies to this claim and applies

the maritime standard. Id. at 15–16. As discussed, supra pp. 61–70, however, Georgia state law applies.

"In Georgia, '"[t]respass" means any misfeasance, transgression, or offense which damages another's health, reputation, or property.'" Plantation at Bay Creek Homeowners Ass'n, Inc. v. Glasier, 825 S.E.2d 542, 549 (Ga. Ct. App. 2019) (quoting O.C.G.A. § 1-3-3(20)). O.C.G.A. Section 51-10-3 provides, "Any unlawful abuse of or damage done to the personal property of another constitutes a trespass for which damages may be recovered." Here, Crum Plaintiffs allege that Norton Lilly unlawfully damaged their personal property. Dkt. No. 56 ¶ 174 ("Defendants' activities caused the vessel's capsizing and the discharging of fuel, oil, cars, car parts, materials, debris, and other hazardous fluids into the Sound and surrounding waterways, thereby damaging Plaintiffs personal property, including their vessels, mechanical systems, and equipment."). Norton Lilly "fails to cite to a Georgia case where a scienter requirement has been imposed as a prerequisite for a claim for trespass to personalty" such that a defendant must intend to commit trespass to personalty rather than to intend to commit the act that led to the trespass. Bowen v. Porsche Cars, N.A., Inc., 561 F. Supp. 3d 1362, 1376 (N.D. Ga. 2021). Thus, because Crum Plaintiffs allege "damage done to the personal property of another," they state a claim for trespass to personalty. O.C.G.A. § 51-10-3. Norton Lilly's motion to dismiss,

dkt. no. 75, is therefore **DENIED** as to Crum Plaintiffs' trespass claim.

## IV.  Punitive damages and attorney's fees

Norton Lilly also seeks dismissal of Crum Plaintiffs' claims for punitive damages and attorney's fees. Dkt. No. 75 at 8-9, 16-18.[11]

> In Georgia, when the tortious conduct amounts to "wil[l]ful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences[,]" punitive damages are allowed pursuant to OCGA § 51-12-5 to deter the wrongdoer from repeating his wrongful acts. Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award.

Colonial Pipeline Co. v. Brown, 365 S.E.2d 827, 830 (Ga. 1988).

Crum Plaintiffs allege: they "have repeatedly asked Defendants over the past year to cease their actions and clean up the Sound and surrounding environment, but Defendants have failed to take effective and appropriate action to remedy the situation and the ongoing discharges;" "Defendants' actions and inaction show willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which raises the presumption of

---

[11] Because Crum Plaintiffs' maritime negligence claim is dismissed, the Court need not address whether Plaintiffs may recover punitive damages under federal maritime law. See Dkt. No. 75 at 8-9 (arguing that Plaintiffs could not recover punitive damages under maritime law).

conscious indifference to the consequences of such actions;" and "Defendants have acted and failed to act with the specific intent to cause harm to Plaintiffs and their use and enjoyment of the Sound and surrounding environment such that there is no cap on the amount of punitive damages that a jury may impose in this case." Dkt. No. 56 ¶¶ 192–94. This, in conjunction with Crum Plaintiffs' allegations that Defendants have created a continuing public nuisance, sufficiently alleges willful misconduct. Thus, Crum Plaintiffs' allegations support a claim for punitive damages.

O.C.G.A. § 13-6-11 permits recovery of expenses of litigation, including attorney fees, "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." "Bad faith warranting an award of attorney fees must arise out of the transaction on which the cause of action is predicated, and it may be found in how the defendant acted in his dealing with the plaintiff." Foxchase, LLLP v. Cliatt, 562 S.E.2d 221, 223 (Ga. Ct. App. 2002).

> Bad faith requires more than bad judgment or negligence, rather the statute imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will. Questions concerning bad faith under this statute are generally for the jury to decide, and the trial court may grant judgment as a matter of law on such issues only in the rare case where

> there is absolutely no evidence to support the award of
> expenses of litigation. Even slight evidence of bad
> faith can be enough to create an issue for the jury.

Kin Chun Chung v. JPMorgan Chase Bank, N.A., 975 F. Supp. 2d 1333,
1351 (N.D. Ga. 2013) (citations omitted) (internal quotation marks
omitted).

Here, Crum Plaintiffs allege that Defendants acted in bad
faith by "fail[ing] to take effective and appropriate action to
remedy the situation and the ongoing damages." Dkt. No. 56 ¶¶ 196–
97.  Drawing inferences in favor of Plaintiffs, this implies a
"breach of known duty through some motive of interest of ill will."
Kin Chun Chung, 975 F. Supp. 2d at 1351. Thus, Norton Lilly's
motion to dismiss, dkt. no. 75, is **DENIED** as to punitive damages
and attorney's fees.

## CONCLUSION

Crum Plaintiffs properly presented their OPA claims to the
Vessel Defendants. Because Crum Plaintiffs concede that they do
not seek natural resource damages, the Vessel Defendants' motion
to dismiss, dkt. no. 74, is **GRANTED** as to natural resource damages
under the OPA, to the extent the amended complaint asserts such
claims. Because Crum Plaintiffs' presentments did not include
claims for subsistence use damages, the Vessel Defendants' motion
to dismiss, id., is **GRANTED** as to subsistence use damages under
the OPA. All Plaintiffs sufficiently presented claims for property

damages under the OPA, so these claims remain pending. The Vessel Defendants' motion to dismiss, id., is otherwise **DENIED** as to Crum Plaintiffs' OPA claim.

Since the OPA displaces Crum Plaintiffs' federal maritime negligence claim against the Vessel Defendants, the Vessel Defendants' motion to dismiss, dkt. no. 74, is **GRANTED** as to that claim. As the Vessel Defendants do not seek dismissal of Crum Plaintiffs' state-law claims, these claims remain pending.

Similarly, Crum Plaintiffs' federal maritime negligence claim against Norton Lilly is displaced by the OPA. Thus, Norton Lilly's motion to dismiss, dkt. no. 75, is **GRANTED** as to Crum Plaintiffs' federal maritime negligence claim. Crum Plaintiffs' state-law causes of action for negligence, negligence per se, public nuisance, and trespass against Norton Lilly are not preempted, and Crum Plaintiffs' allegations sufficiently state a claim as to each of these causes of action. Thus, Norton Lilly's motion to dismiss, id., is **DENIED** as to Crum Plaintiffs' state-law causes of action for negligence, negligence per se, public nuisance, and trespass.

The stay of these proceedings is hereby lifted. The Parties are **ORDERED** to file proposed discovery deadlines within **fourteen (14) days** of the date of this Order.

**SO ORDERED** this 13th day of September, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA